Georgianna JOHNSON, Gwendolyn Gittens, Sara West, Sylvia Thompson, Gerard Despinosse, Dorothy Butler and Evelyn Gervais, Plaintiffs,

v.

Edward KAY, Marshall Garcia, Dennis Rivera, Eustace Jarrett, Sylvia Grant–Gutierrez, Carlton Yearwood and Angela Doyle, Betty Hughley, Katherine Abelson, Dalton Mayfield and Aida Garcia, Defendants.

No. 87 Civ. 6482 (RWS).

United States District Court, S.D. New York.

Oct. 8, 1987.

Connerton & Bernstein, Attorney for Plaintiffs Washington, D.C., Terrell C. Evans, Brooklyn, N.Y., Jules Bernstein, Lau-

rence E. Gold, Eric Steele, Washington, D.C., of counsel.

Gladstein, Reif, Meginnis, Attorneys for Defendants, Brooklyn, N.Y., for defendants; James Reif, of counsel.

## OPINION

SWEET, District Judge.

Plaintiff Georgianna Johnson ("Johnson"), President of Local 1199, Drug, Hospital and Health Care Employees Union ("Local 1199"), an affiliate of the International Retail, Wholesale and Department Store Workers Union ("RWDSU"), has moved pursuant to Fed.R.Civ.P. 65(a) for a preliminary injunction staying an impending membership referendum on proposed amendments to the union constitution. For the reasons set forth below, the elections will be scheduled to be completed by November 4, 1987, and other relief, more specifically tailored to the imminent injury, will issue.

### Prior Proceedings

This case started on September 8, 1987, when Johnson brought an Order to Show Cause seeking an injunction for meetings that were to be held that night and in coming nights enjoining Edward Kay ("Kay") and the other defendants from interfering with union members' ability to speak. Consideration of the application was adjourned to the morning of Friday, September 10, and then, by consent, again adjourned to September 21.

By September 16, three more Orders to Show Cause had been filed, all made returnable on September 17. The firm Rabinowitz, Boudin, Standard, Krinsky & Lieberman moved on behalf of Local 1199 to remove the firm Connerton & Bernstein as counsel for Local 1199, and to realign the Local from a party-plaintiff to a party-defendant. Johnson moved for an order enjoining Kay from exercising control over the Local's newspaper, over the Local's staff, and from otherwise usurping her alleged constitutional powers. Kay moved to enjoin Johnson from cancelling meetings of Local 1199's Executive Council.

On September 17, the issues before the court were reviewed, the court established a schedule of hearings, and proceedings were adjourned until Monday, September 21. On September 21, after taking evidence and hearing argument, the court struck Local 1199 as a party-plaintiff and denied its application to intervene as a party-defendant in an opinion from the bench.

On September 22, after taking evidence and hearing argument, the firm Levy & Eisner was disqualified from representing Kay on the grounds that the firm had been general counsel to the Local and in that capacity had received communications from President Johnson on an issue that was virtually identical to a substantial issue in this case.

On September 23, acting on charges brought by Johnson, President Lenore Miller of the RWDSU temporarily suspended Kay from his activities as Secretary–Treasurer of Local 1199. That evening, after receiving the news of Kay's suspension, the Rabinowitz firm by an *ex parte* application sought a temporary restraint staying Kay's suspension. The parties were directed to appear the next morning.

On the morning of September 24, Local 1199 filed a new suit, *Local 1199 v. RWDSU*, 87 Civ. 6862, which was referred to me as related to the instant action. Local 1199's application was granted, and Kay's removal stayed for reasons set forth orally. The motion on the preliminary injunction seeking the same relief was made returnable October 1 at 9:30. At the September 24 hearing, Johnson made an oral application to intervene, which was denied with leave to renew.

The afternoon of the 24th, Johnson was heard on her application for a preliminary injunction directing the defendants to pay for a mailing from her to the union members. The injunction was entered, and the defendants were directed to pay for such a mailing. The parties settled an order memorializing the terms of the decision the following morning. Also on the 24th, issues relating to the parties' pendant claims involving the union constitutions were re-ferred to a Special Master, Dean of Hofstra Law School, Eric J. Schmertz.

On September 25, a stipulation was signed by the court resolving the disputes over the alleged intimidation at meetings that had originally been at the heart of the case.

From the afternoon of September 25 until the morning of October 1, four more Orders to Show Cause were brought to the Part I judge because I was out of the jurisdiction. Of these, one discovery motion was made returnable before the Special Master, and the other three were returned unsigned on the grounds of insufficient showing of the need for immediate relief.

During my absence from the jurisdiction, parties for both cases met with the Special Master, and continued their motion practice before him. Because of the heat of the litigation, the Special Master was not in a position to issue a formal report to the court by October 1, but did appear and informally apprised me of progress that the parties had made toward resolving certain of the issues involving interpretations of the relevant constitutions. On the morning of October 1, both parties submitted briefs on an issue that had not before been joined, but which parties, the Special Master and the court all deemed the central issue in the dispute: the propriety of the election procedures that the Executive Council had put in place for the proposed amendments to Local 1199's constitution. Johnson orally moved to enjoin the elections on the grounds that the procedures were infirm. Kay, urging that these questions were of primary importance, agreed to have argument go forward on the issue immediately. Also on October 1, argument was heard in the related case as to whether the temporary restraint would be converted into a preliminary injunction, the details of which are discussed more fully in *Local 1199 v. RWDSU*, 87 Civ. 6268, filed herewith. The Special Master set a schedule for weekend meetings. Decision was reserved on both motions, and the parties were directed to return to court at 9:30 on Monday, October 5 after filing supplemental papers. On Oc-

tober 5, the Special Master scheduled a further meeting from 7:00 p.m., which continued to 2:00 a.m. on Tuesday, October 6.

The Special Master requested that the hearing be postponed until 4:00 p.m., at which time he and the parties appeared. No consensual agreement on the issues separating the parties was reached. Testimony in the related case was taken that evening, and continued and finished the morning of Wednesday, October 7.

**The Facts**

The facts and prior proceedings establish the existence of a power struggle among the top officers of Local 1199. The major contenders are Johnson and Kay, who were elected as members of the same reform slate and who have had a falling out over the direction of the union. Although the details of their policy disagreement are not fully revealed in this record, the tension has come to center on a set of amendments which the Executive Council has proposed to the Local's constitution and which Johnson opposes.

Local 1199 is a significant and powerful union of more than 70,000 members with a complicated history of internal struggles and allegiances with the national labor movement. The current affiliation of 1199 with RWDSU has followed various merger proposals and realignments that had been proposed in the early part of this decade. The annual contributions of Local 1199 to the RWDSU exceed $2.5 million.

In this dispute, a large majority of the Executive Council, which as established by Local 1199's constitution consists of all the officers of the union, has sided with Kay, and many of its members are named defendants in this lawsuit. Both parties have represented that the amendments in question will have a significant effect on the structure and operation of the Local.

The battle over the amendments started on August 14, 1987, when a non-voting rank and file member of the Executive Council proposed the creation of a "Constitution Committee." Johnson was present at the meeting and voted against the resolution, which nonetheless passed. Johnson did not appoint the committee that the reso-

lution provided for and refused to serve on it.

Apparently, the committee was constituted, nonetheless, and made a series of proposals. Johnson has alleged that Robert Muehlenkamp ("Muehlenkamp") helped frame the amendments. Muehlenkamp is a member of neither Local 1199 nor the RWDSU, but is an executive vice-president of the National Union of Hospital and Health Care Employees (the "National"), AFL–CIO, and attended several of the Executive Council meetings at which the amendments were discussed.

On September 4, 1987, the Executive Council met again and voted to initiate a proposal that would amend the Local's constitution. Johnson was present at this meeting also, and again voted against the proposal. Johnson has proffered that the proposal considered and approved by the Executive Council was the one generated by the Constitution Committee. Under the Local 1199 constitution, once passed by the Executive Council, the proposed amendments must be submitted to a vote of the Local membership within 60 days, which is November 4. Art. XII(b).

In the form approved by the Executive Council, the proposed amendments consist of a single, indivisible proposal. If and when the amendments are submitted to a vote by the general membership of the union (as is required by the constitution) members will have to vote up or down on the entire proposal.

The Executive Council has determined that the referendum on amendments will be voted on in a series of votes stretching from October 12 to October 17 in the various Chapters of the Local, rather than at a single large meeting at which everyone would vote at a single time. Local 1199's over 70,000 members work at various locations, some of which are as much as 100 miles from New York City. Kay has adduced undisputed evidence to show that the constitution has been amended through this procedure in the past. It has been proffered that meetings of the general membership of Local 1199 have been rare, al-

though large segments of the Local have met under a single roof on such occasions as strike votes.

Shortly after the Executive Council voted to propose amendments to the constitution, a conflict arose over the control of the monthly union newspaper, the *Local 1199 News*. According to Johnson, since becoming president of Local 1199, she has written a column that appears in the *1199 News*. The defendants concede that, historically, this column has been the president's personal forum. On Tuesday, September 8, 1987, Johnson sent a copy of what she wished to have published as her regular column to Zita Allen ("Allen"), an 1199 staff member who is the editor of the *News*. Johnson attached a memo to the column directing Allen to print it, in English and Spanish, on the first and last pages of the newspaper. By Thursday, September 10, Johnson had heard nothing from Allen, and sent her another copy of the column with a covering memo. Saying that she was "deeply concerned that your absence from the building may be related to purposely having this issue of the 1199 News delayed," Johnson demanded that Allen get the issue to press containing the column that Johnson had submitted. That day, the Executive Council met and passed a number of resolutions. Among them was "Resolution # 5," which provided:

RESOLUTION OF THE EXECUTIVE COUNCIL OF LOCAL 1199, AT A SPECIAL MEETING HELD ON SEPTEMBER 10, 1987

RESOLUTION # 5

WHEREAS, it has been the consistent, unquestioned practice and policy of the Executive Council and its designee, Executive Vice President Dennis Rivera, to determine the content of the Local 1199 newspaper, known as *Local 1199 NEWS*, and to mail it on behalf of the Union to the Union membership; and

WHEREAS, it is the duty of the Executive Council to formulate plans, programs and policies for the Local pursuant to the Local 1199 Constitution, Article VII, Section 10(b)(7);

NOW, THEREFORE, at a special meeting of the Executive Council duly convened on September 10, 1987, it is hereby RESOLVED, as follows:

1. Dennis Rivera shall determine the contents of an issue of *Local 1199 NEWS* which addresses the proposed changes to the 1199 Constitution and shall report to the Executive Committee [sic] regarding its contents for final approval;

2. The Executive Council shall give final approval to the contents of said issue;

3. Dennis Rivera shall distribute said issue of *Local 1199 NEWS* to the membership of Local 1199; and

4. No other officer or member of Local 1199 may prepare, contribute to, or distribute any newspaper or publication purporting to be the *Local 1199 NEWS* or an official 1199 publication, or which bears the official 1199 logo without the prior written approval of the Executive Council.

Allen has sworn that the column was not delayed out of any challenge to Johnson's authority, but simply because she, Allen, was home sick.

In early to mid-September, the members of the Executive Council sent out two mass mailings to the membership. One was titled: "Here's What You Should Know About the Executive Council's Proposals for a Change in Local 1199's Constitution." The other was called "Strengthening the Powers of 1199 Members: Proposed Constitutional Changes." The former is a four page letter to the membership (two pages in English and two in Spanish), and the latter a slick, 18 page (again half English, half Spanish) brochure. Both strongly endorse the proposed amendments in the name of the Executive Council, and neither give any indication that there is any dissent within the Executive Council.

By Memorandum dated September 17, 1987, Johnson scheduled a meeting of the Local's General Delegate Assembly for November 5, 1987. Also on September 17, 1987, Johnson sent a memorandum to Den-

nis Rivera ("Rivera") stating: "This will advise that pursuant to my authority under the provisions of Article VII, Section 2(a) and (n) of the Constitution of Local 1199, you are herewith relieved of the position of Executive Editor of the *Local 1199 News*. I am assuming responsibility for the production of the newspaper myself immediately. Please provide me with a report in writing by 5 p.m. today regarding the present status of the September issue. In light of my action, nothing further should be done by you regarding the September issue of the *1199 News* in general until further notice from me." (footnotes omitted). Sometime before September 21, the defendants had also distributed a five page typed document titled "QUESTIONS AND ANSWERS ABOUT WHAT'S GOING ON AT 1199" which discusses the amendments and the struggle between Johnson and Kay, again putting forth the Executive Council's position.

On September 25, the September issue of the *Local 1199 News* appeared, several weeks late. The issue did contain Johnson's column, and she was shown the galleys and bluelines of her column before the issue went to press. However, between the time that Johnson submitted her column and the time the issue hit the membership, the defendants added three pages to respond to Johnson's column, attacking her, and advocating the amendments. Johnson's column covers approximately one-half page. There has been a proffer, not denied by counsel for Kay at argument, that 1199 staff members paid by Local 1199 have been working on behalf of the passage of the amendments. There is evidence in the record that because of this intramural dispute, the local is on the brink of chaos. The lack of harmony among the top officers is threatening the smooth functioning of the necessary day-to-day operations of the union.

**The Issues Presented**

Johnson has challenged the constitutionality of the upcoming referendum on the following grounds: first, that the proposal itself was generated by a "Constitution Committee" that was formed through procedures not permitted by the current union constitution; second, that presenting the amendments as a package—rather than as individual proposals from which members of the union could pick and choose—denies the union membership the right to a meaningful vote that is guaranteed by Title I of the Labor-Management Reporting and Disclosure Act ("LMRDA"), codified at 29 U.S.C. §§ 401–531; third, that the specific method through which the voting is to be conducted (at chapter meetings rather than a general membership meeting) is infirm under the constitution; fourth, that one of the provisions of the proposed amendments violates RWDSU's constitution, and that, consequently, whether the entire proposal is infirm; fifth, that the elections should be stayed to allow the General Delegate Assembly to pass on the propriety of the proposed election procedures; and finally, that by controlling the union's internal communication facilities, the Executive Council has effectively silenced her in violation of the constitution, which will render the election void.

**Standards for Injunction Relief**

As the Second Circuit stated recently in *Hanson Trust, PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir.1986), in order to obtain a preliminary injunction, an applicant must show:

(a) irreparable harm and

(b) either

(1) likelihood of success on the merits or

(2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*See also Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir.1979); *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 653 F.Supp. 47, 55 (S.D.N.Y.1985); *American Motor Club, Inc. v. Corcoran*, 644 F.Supp. 862, 865–66 (S.D.N.Y.1986).

**Propriety of Procedures Initiating Amendments**

■ According to Johnson, the entire referendum on the amendments is tainted

because the actions of the "Constitution Committee" were *ultra vires.*

The constitution, however, explicitly provides: "Amendments to this Constitution may be initiated by ... [a] majority of the Executive Council...." Art. XII(a)(2). Coupled with the provision that grants the Executive Council the authority to "formulate plans, programs and policies for the Local," Art. VII § 10(b)(7), the power to initiate amendments necessarily carries with it the power to generate proposals for internal Council discussions in a reasoned and orderly fashion, and the creation of a committee to do so is an appropriate exercise of that power.

However, even if the creation of the Constitution Committee is beyond the authority of the Executive Council (or assuming *arguendo* that Muehlenkamp drafted them instead of the Constitution Committee), the Executive Council's actions on September 4 are not tainted. No matter who originally crafted the amendments, there is no dispute that a properly constituted meeting of the Executive Council on September 4 voted to propose the amendments to the general membership. This counts as "initiation" of the amendments regardless of the initial source of the proposals. The procedures leading up to the September 4 Executive Council vote, therefore, are not infirm under Local 1199's constitution, and do not provide the grounds for an injunction.

**Presentation of the Proposed Amendments as a Package**

■ Presentation of the proposed amendments as a single block is challenged as a violation of the union members' right to a meaningful vote in violation of § 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1), which provides:

> Every member of a labor organization shall have equal rights and privileges within such organization ... to vote in elections or referendums of the labor organization....

Under certain circumstances, the combination of issues on a single ballot can deprive a union member of a "meaningful vote." *See, e.g., Sertic v. Cuyahoga, Lake, Geauga & Ashtabula Counties, C.D.C.,* 423 F.2d 515 (6th Cir.1970). That case, however, which also implicated 29 U.S.C. § 411(a)(3) (right to vote on dues increase), involved a case where union members could not vote against a dues increase without also voting against negotiations for a wage increase. After discussing *Sertic,* this Circuit concluded that while in some circumstances combining issues might deprive union members of a meaningful vote, in others breaking up the provisions of an interrelated document for change could create chaos in a union: "The adoption of some of those provisions and the rejection of others might have resulted in an unworkable document, and thrown the operation of the union into confusion." *Sheldon v. O'Callaghan,* 497 F.2d 1276, 1280 (2d Cir.), *cert. denied,* 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974).

The proposed set of amendments undertake to shift the center of power in the union. They decrease the power of the President's office, increase the power of the Executive Council, and append a section that gives the membership at large a new right to reverse by referendum any policy or action of the Executive Council on initiation by petition of the membership. To require that these provisions be broken down so that the membership can pick and choose among them might well result in a combination of amendments that would result in substantial internal inconsistency.

It is also alleged that misinformation about the legal necessity of the amendments is being circulated by the Kay faction, and that, consequently, union members may be misled into thinking that they have a "forced choice." *See generally Young v. Hayes,* 195 F.Supp. 911 (D.D.C. 1961). Because of the relief that will be granted, as outlined below, affording Johnson access to union communications facilities, she will be able to correct any statements she believes to be misleading in this respect, and, consequently, the danger of members being misled will be drastically reduced, if not eliminated. *Cf. Sheldon v. O'Callaghan,* 497 F.2d 1276, 1281–83 (2d Cir.1974) (harm of misleading information

abated by allowing dissident party to mail to union members from union mailing list).

**Chapters versus General Membership**

■ Article XII of the constitution provides:

(b) The Executive Council shall submit the proposed amendment(s) *to a vote of the Local membership* within sixty (60) days from the date of initiation of the amendment(s) or receipt of a valid petition.

(c) A copy of the proposed amendment(s) shall be mailed to the members of the Local at least fifteen (15) days before *the meeting* at which such amendment(s) are to be submitted to a vote. A copy of any proposed amendment(s) appearing in the Local publication and mailed at least fifteen (15) days before *such meeting* shall be deemed good and sufficient notice for this purpose. (emphasis added)

Article V § 1 provides: "A decision of the General Membership shall require a majority vote of those *present* and voting." (emphasis added)

A question has been presented as to whether these provisions demand a single meeting of the General Membership to vote on amendments of the union constitution, and, consequently, whether the defendants' plan to have the referendum voted on over several days at the various chapter locations violates the constitution. According to Johnson, amending the constitution is not a power of the Local's Chapters enumerated in Article V § 4, and rather is the exclusive domain of the General Membership pursuant to Article V § 1(a).

Kay does not take issue with the proposition that only the General Membership can amend the constitution, but argues that it can do so without meeting in a single room to cast votes. Article V § 5 provides: "Members of the Local shall meet on a General, Division, Area or Chapter membership basis at least once every two (2) months." The Executive Council urges that this provision stands for the proposition that the members of the union can "meet" collectively by meeting in their various subdivisions.

Perhaps more important, Kay has submitted evidence that it has been the long-standing practice of the union to conduct elections on constitutional amendments in precisely the manner which is proposed here: in the chapters. It is not disputed that amendments have previously been approved in this manner.

Another provision of the constitution also bears on this question. Article VII § 10(b)(6) provides:

The Executive Council shall have the [power to] interpret this constitution, and any such interpretation made by it shall be final, binding and conclusive and shall remain in full force and effect, unless reversed, modified or otherwise changed by each of the Division Delegate Assemblies.

Such a provision does not vest unlimited power to construe the constitution in the Executive Council. Unless a rule of reasonableness is read into it, the provision would give the Executive Council the power effectively to amend the constitution at will—enabling the Council to "construe" the constitution so as drastically to curtail the presidency or the Division Delegate Assemblies.

However, at stake here is a technical construction of provisions of the constitution which are ambiguous, and which do not themselves affect the fundamental balance of power struck by the constitution. The Executive Council's construction does not challenge the fundamental proposition that it is the full membership of the union that must make the decision, and is supported by a long history of union practice. The sole question being whether the membership must meet under a single roof to exercise its powers, the Executive Council's construction is "an interpretation fairly placed on union rules by the union's authorized officials." *Drywall Tapers & Pointers v. Operative Plasterers & Cement Masons' Int'l Ass'n*, 601 F.2d 675, 679 (2d Cir.1979) (quoting *English v. Cunningham*, 282 F.2d 848, 850 (D.C.Cir.1960)).

Finally, this construction is in accord with a "Guiding Principle" of the Local as set forth in Article III § 2(a): "The policy

of the Local and its methods of operation shall be such as to facilitate and stimulate the broadest possible rank and file participation in the formulation and execution of the program of the Local...." It virtually goes without saying that a better voting turnout can be predicted from the rank and file if the polling places are at their places of work (the chapters) rather than in a centralized location, away from their homes and jobs, during non-working hours.

## The Impending Meeting of the General Delegate Assembly

In addition, Johnson requests an injunction to stay the voting process just described pending the General Delegate Assembly meeting now scheduled by Johnson to take place on Thursday, November 5, 1987.

Under the constitution, the General Delegate Assembly "shall have all of the powers conferred upon the Division Delegate Assemblies by this constitution...." Art. VII, § 11(1)(c). The Division Delegate Assemblies have the authority to "reverse[ ], modify or otherwise change[ ]" interpretations of the Local 1199 Constitution by the Executive Council. Art. VII, § 10(b)(6). Johnson has consequently asked the court to stay the vote on the amendments past the constitutionally mandated November 4 deadline, in order for the General Delegate Assembly to pass on the questions that she raises concerning the construction of Local 1199's constitution.

Whether or not reconstruction of the voting provisions by the General Delegate Assembly *after* a vote had been completed under the Executive Council's procedures would invalidate the entire vote is an issue which need not now be resolved. Such a determination will abide the event that the General Delegate Assembly votes to reconstrue the constitutional provisions establishing the procedure for the vote, if that should occur.

## The Clash of the Amendments with RWDSU's Constitution

An injunction is also sought on the grounds that one of the proposed amendments is said to conflict with a provision of the RWDSU constitution, and that, conse-

quently, the entire slate of proposals is infirm.

Proposed Article VII, § 10(b) would confer authority upon the Executive Council "to establish such standing and ad-hoc committees of the Executive Council as it deems appropriate." This is said to conflict with Article IX, § 17 of RWDSU's constitution, which provides: "The local president ... shall appoint all committees not otherwise provided for and be ex-officio member of all committees."

Before any injury could occur, the amendments—which are still hotly contested—must pass, and the Executive Committee must exercise its new power. Even then there would still be issues of severability to address, not to mention the issue of what specific injury is posed under those circumstances by the creation of whatever committee it is that the Executive Council has tried to establish. This is not a sufficient threat of harm to sustain an injunction against the entire referendum.

## De Facto Recall

The proposed amendments, which by their terms will go into effect immediately upon adoption, are challenged as amounting to a *de facto* recall of Johnson from the office of the presidency, and, consequently, it is submitted that the court must either enjoin the election or declare now that the amendments will not strip her of any of the powers of the office at the time that she was elected.

According to Johnson, at the time of her election she was vested with power by the constitution under which she was elected, and that during her term these powers cannot be constitutionally diminished. However, accepting Johnson's premise that the president is vested with exactly the powers of the constitution under which she takes office does not lead to the conclusion that she urges. Along with specific powers and duties, the constitution also lays out the procedures by which it may be amended, and explicitly envisions that the constitutional structure can be changed at any time, effective immediately. Article XII(d) provides that amendments "shall be-

come effective upon [their] adoption unless otherwise provided for." Consequently, the contractual right that Johnson has under the Local's constitution is a right to certain powers until they are changed through the constitutionally mandated procedures.

## Controlling Communication Within the Local

■ According to Johnson, the acts that the defendants have taken to control communication between the officers and the general membership have deprived her of her rights under federal law and under the union constitution. Under New York law, "A union's constitution and by-laws constitute a contract between the union and its members and define not only their relationship but also the privileges secured and the duties assumed by those who become members, unless contrary to public policy." *Ballas v. McKiernan*, 41 A.D.2d 131, 341 N.Y.S.2d 520, 522 (1973), *aff'd*, 35 N.Y.2d 14, 358 N.Y.S.2d 695, 315 N.E.2d 758, *cert. denied*, 419 U.S. 1034, 95 S.Ct. 517, 42 L.Ed.2d 309 (1974). In addition, the constitution contractually binds the officers of a union to act within the constitution's framework. *Simoni v. Civil Service Employees Ass'n*, 133 Misc.2d 1, 507 N.Y.S.2d 371, 377 (Sup.Ct.1986) ("[T]he board of directors [of the union] must conduct its management within the framework of the union's constitution and by-laws, which constitute a contract between it and the general membership.").

As evidenced by its constitution, as well as by testimony that has been received and by proffer of counsel, Local 1199 particularly prides itself on being a democratic union. Indeed, the Kay faction has advanced the proposed amendments to the constitution on the grounds that they are purported to lead to a more democratic Local and broader rank and file participation in the management of the union.

Article III § 2(a) of Local 1199's constitution, titled "Guiding Principles," provides: "The policy of the Local and its methods of operation shall be such as to facilitate and stimulate the broadest possible rank and file participation in the formulation and execution of the program of the Local and to encourage development of the most effective leadership." Subsection (b) of the same Article provides: "There shall be full respect for all differences of opinion, and all members shall have full freedom of expression."

As held in the September 21 opinion from the bench on the subject of the proper alignment of Local 1199 in this action, the union's constitution has constructed a system of shared and divided responsibilities between the President, as the constitutionally appointed chief executive, and the Executive Council. When the President and the Executive Council are not working in concert, as they have not been here, the constitution imposes a delicate balance of responsibilities, powers, and duties.

The duty of the President that is most important here is set forth in Article VII § 2(g): "The President shall report to the Division Delegate Assemblies and the membership on behalf of the Executive Council." The duty of the President to report to the membership carries with it a necessary right of access to the means to report in a meaningful manner. As a member of the Executive Council on whose behalf she is reporting, the President, of course, has the power to report her own views as well of those of the majority.

Here, the Executive Council has virtually monopolized the means of union communication. It has taken control of the Local's newspaper, it has complete control of the purse to send out mailings urging the amendments' adoption, and it may have enlisted paid staff members to work in favor of the amendments. The one communication that the Executive Council has allowed from Johnson to the membership has been a column that she wrote for the union paper. However the column was held from publication long enough that the issues it addressed were growing stale, and when it did appear it was followed by a more current and longer submission from the Executive Council forcefully addressing the issues that had arisen since the President submitted the column for publication.

The LMRDA does not grant license to a court to enforce its own vision of union democracy. However, the LMRDA has been sufficient for this Circuit to require a union to give dissident union members an opportunity to use the union mailing list in the name of a fair referendum. *Sheldon v. O'Callaghan*, 497 F.2d 1276, 1282 (2d Cir.), *cert. denied*, 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974). Here, the issue goes beyond the obligations imposed by the LMRDA to the contractual rights between Local 1199's President and the Executive Council. Johnson's contractual right to report in a meaningful way has been infringed.

In addition, the union's contractual "Guiding Principle" that its methods of operation shall be designed to stimulate the informed participation of the rank and file in shaping policy carries with it the general membership's right to hear. To make an informed decision, a union member must hear adequate debate. This general right is given specific meaning in this situation by the President's Article VII obligation to report to the membership, a duty which the Executive Council has been thwarting.

Strictly in terms of construction of the constitutional contract, two other factors weigh into the balance. First, the President has the constitutional power to terminate all non-elected union personnel and temporarily fill any vacancies created by the termination. In the normal course of union operations, this power of removal plainly gives the President significant authority over channels of union communication, which are for the most part physically produced by non-elected personnel, as well as over the operations of the union staff. In order to ensure fair participation in the affairs of the union, paid staff should not be under the control of either faction. While officers may appropriately campaign, such activity by staff under these circumstances appears to be inappropriate.

In addition, Johnson has cited the defendants' actions as a violation of her rights under LMRDA Title I as construed in *Cotter v. Owens*, 753 F.2d 223, 230 (2d Cir. 1985), alleging that the Kay faction is engaging in a "purposeful or deliberate scheme to suppress dissent within the union." Finally, because the amendments by their terms would go into effect immediately upon ratification by the general membership, Johnson views this vote as a *de facto* recall vote, for which she says the provisions of 29 U.S.C. § 481(c) apply, requiring the Executive Council to pay for mailings to the general memberships to advance Johnson's view.[1]

For the contractual reasons set forth above, it is unnecessary to reach the *Cotter* or § 481(c) issues. Nonetheless, it does appear that both factions may have taken steps to silence the opposition,[2] each contributing to a situation in which the rank and file cannot meaningfully exercise their right to be heard on the proposed amendments, because the issues have not been fairly presented and debated.

Several serious potential harms are presented. First, there is a high probability that the election would be tainted by the constitutional inadequacies relating to the respective rights of the officers to commu-

---

1. 29 U.S.C. § 481(c) provides:
   Every national or international labor organization, except a federation of national or international labor organizations, and every local labor organization, and its officers, shall be under a duty, enforceable at the suit of any bona fide candidate for office in such labor organization in the district court of the United States in which such labor organization maintains its principal office, to comply with all reasonable requests of any candidate to distribute by mail or otherwise at the candidate's expense campaign literature in the aid of such person's candidacy to all members in good standing of such labor organization and to refrain from discrimination in favor of or against any candidate ·with respect to the use of lists of members, and whenever such labor organization or its officers authorize the distribution by mail or otherwise to members of campaign literature on behalf of any candidate or of the labor organization itself with reference to such election, similar distribution at the request of any other bona fide candidate shall be made by such labor organization and its officers, with equal treatment as to the expense of such distribution.

2. Johnson's actions in this respect are more fully discussed in *1199 v. RWDSU*, 87 Civ. 6268 (RWS), filed herewith.

nicate with the general membership. Voiding an election on which serious issues of the constitution and the balance of power of the officers turn would effectively paralyze the union, a result that all parties seek to avoid. Recognizing the gravity of that harm, both parties urged the court last Thursday, October 1, to resolve the constitutional issues before any others that remain in this action.

Second, and related, is the injury that would occur if either faction of the Local were permitted to unjustly silence the other. "[W]e know from political experience that once suppressed, the democratic spirit may not soon be revived" in a local. *Navarro v. Gannon*, 385 F.2d 512, 520 (2d Cir.1967) (Lumbard, C.J.), *cert. denied*, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294 (1968). Both of these injuries, harms well beyond the individual harm that the litigants themselves would suffer, are sufficiently serious to justify equitable relief. Indeed, on fewer facts than are now available, the court directed on September 24 that the defendants pay for a single mailing by Johnson, a remedy which in light of changing circumstances is now inadequate to the task and will be modified as set forth below.

As matters now stand, the electoral process is badly out of kilter because of the defendants' wrongful monopolization of the union means of communication, and a procedure is required that enables both sides a meaningful opportunity to put forth their positions fairly before the election. While exact parity in page numbers or in dollars is unnecessary, both sides should now have a chance to speak at approximately the same volume so that neither side can drown the other out, as has been the case so far. Because timing is now so essential, an order must be set establishing a schedule for mailings and or publications, and prohibiting the use of any other mailings or means of communication, including its services of union-paid staff. Johnson will be granted access to the 1199 facilities for a mailing the week of October 12, 1987 or before, reasonably equivalent to that already sent by the Executive Council. Both sides will be permitted to mail jointly an

additional piece the week of October 19, reasonably equivalent in length and format. To permit this information to reach the membership, the vote will be held on October 28. The parties are hereby granted leave to alter the timing here set forth by an agreed upon order to be settled upon this opinion or by submissions in connection with an order to be settled by noon, October 9, 1987.

IT IS SO ORDERED.