860 F.2d 529
 129 L.R.R.M. (BNA) 2760, 110 Lab.Cas. P 10,828
 Georgianna JOHNSON, Gwendolyn Gittens, Sara West, Sylvia
Thompson, Gerard Despinosse, Dorothy Butler and
Evelyn Gervais, Plaintiffs-Appellees,
v.
Edward KAY, Marshall Garcia, Dennis Rivera, Eustace Jarrett,
Sylvia Grant-Gutierrez, Carlton Yearwood and Angela Doyle,
Betty Hughley, Katherine Abelson, Dalton Mayfield and Aida
Garcia, Defendants-Appellants.
 No. 965, Docket 87-7990.
 United States Court of Appeals,
Second Circuit.
 Argued April 14, 1988.
Decided Oct. 25, 1988.
 
 James Reif, Brooklyn, N.Y. (Gladstein, Reif & Meginnis, Brooklyn, N.Y., James M. Altman, Robinson, Silverman, Pearce, Aronsohn & Berman, New York City, of counsel), for defendants-appellants.
 Jules Bernstein, Washington, D.C. (Linda Lipsett, Bernstein & Lipsett, Washington, D.C., Terrell C. Evans, Mannan & Evans, Brooklyn, N.Y., Roy Barnes, Wendell Shepherd, New York City, of counsel), for plaintiffs-appellees.
 Before VAN GRAAFEILAND, NEWMAN and WINTER, Circuit Judges.
 WINTER, Circuit Judge:
 
 
 1
 This appeal from the grant of an injunction concerning the use of a union's resources in a referendum arises out of a struggle for power between the President and Executive Council of an 80,000 member local union. It raises several issues. The threshold question turns on whether subject matter jurisdiction exists under either Section 102 of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. Sec. 412 (1982), or Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. Sec. 185 (1982), that justifies an assertion of pendent jurisdiction over plaintiffs'[1] state law claims. Second, because we conclude that the district court did have jurisdiction, we must decide whether the case is moot because the events with which the injunction was concerned have occurred. Third, we must determine whether the union itself should have been joined as a party. Finally, we address whether Judge Sweet abused his discretion in granting the preliminary injunction.
 
 BACKGROUND
 A. Allegations of the Complaint
 
 2
 The jurisdictional issue requires us to examine the facts alleged by plaintiffs in the First Amended and Supplemental Verified Complaint filed on September 15, 1987. Those allegations follow.
 
 
 3
 Local 1199, Drug, Hospital and Health Care Employees Union (sometimes the "union"), an affiliate of the International Retail, Wholesale and Department Stores Union ("RWDSU"), AFL-CIO, is a labor organization that represents approximately 80,000 hospital workers in New York City and surrounding counties. Under Local 1199's constitution, the union is governed by a President and an Executive Council consisting of all the officers of the union, including the President. In May 1986, plaintiff Georgianna Johnson and all of the defendants were elected as members of the "Save our Union" slate pledged to reform and democratize the union. Johnson was elected President, while the others assumed various posts as officers of the union. All became members of the Executive Council.
 
 
 4
 For about a year, President Johnson and the Executive Council functioned smoothly together. Beginning in the spring of 1987, however, Johnson became convinced that Edward Kay, the union's Secretary-Treasurer, had begun to usurp her powers under the union's constitution. She also learned that Kay was not fulfilling his constitutional responsibilities as Secretary-Treasurer of Local 1199 but had instead delegated those responsibilities to another officer. A power struggle ensued between Johnson and the Executive Council, led by Kay. Kay told Johnson that he would not tolerate her exercising the constitutional responsibilities of her office. Kay had in fact begun to usurp some of these duties, such as hiring staff and calling and chairing union meetings.
 
 
 5
 When Johnson sought advice from the union's general counsel regarding her constitutional powers, the union's lawyer did not respond. She then sought advice from outside counsel, whom she invited to Executive Council meetings. The Executive Council attempted to bar Johnson's lawyer from its meetings and voted not to disburse any union funds to pay Johnson's lawyer. At an Executive Council meeting held August 28, 1987, a member of the Council rose as if to strike Johnson. When that altercation was broken up, the same member attempted to assault Johnson's executive assistant. On August 31, Kay responded to a memorandum Johnson had written to him concerning his failure to fulfill his constitutional duties as Secretary-Treasurer. Kay told Johnson that he "would burn Local 1199 headquarters to the ground before he would relinquish control" of the union to her.
 
 
 6
 At the Executive Council meeting held on September 4, 1987, in an incident planned and directed by Kay and the other defendants, approximately thirty-five local organizers and staff members invaded the meeting room, stood around the meeting table and glared at Johnson. This action was contrary to the union's policy that such meetings are not open to organizers, staff and members other than those invited to conduct particular business. Realizing that the meeting could not go on under those circumstances, Johnson adjourned the meeting and left the room. The intruders refused to leave the executive offices of the union upon Johnson's orders, but did leave at Kay's request.
 
 
 7
 After Johnson had adjourned the meeting and left the room, Kay reconvened the meeting. Kay and the other defendants then "schemed and plotted to disrupt Division Delegate Assembly meetings scheduled for September 8, 9, and 10 by having their supporters crowd the microphones, ... thereby making it physically impossible for any Johnson supporters to address the meetings." Later, Kay and his supporters planned and arranged for members not entitled to attend Division Delegate Assemblies to come to the meetings for the purpose of disrupting them. Because of the size and structure of Local 1199, Division Delegate Assemblies are the only vehicle other than elections to office for rank and file members to participate directly in union decision making.
 
 
 8
 On September 8, 1987, Local 1199, Johnson and five union members filed a complaint in the Southern District of New York, alleging federal question jurisdiction under Section 102 of LMRDA, 29 U.S.C. Sec. 412; Section 301 of LMRA, 29 U.S.C. Sec. 185; and pendent jurisdiction. Plaintiffs alleged violations of Section 101(a)(1) and (2) of LMRDA, 29 U.S.C. Sec. 411(a)(1) and (2), and of state law based on the union's constitution, stemming from defendants' alleged intimidation tactics and interference with plaintiffs' exercise of their membership rights. Kay and five other members of the Executive Council were named as defendants. The complaint sought preliminary and permanent injunctive relief, a declaratory judgment and damages.
 
 
 9
 On the same day, Johnson attended and chaired the Delegate Assembly meeting of the union's Hospital Division. Approximately six hundred people attended the meeting, which at times was raucous. At one point Kay called Johnson a name. Johnson ignored the insult, and, shortly thereafter, a delegate called Kay a name. Johnson spoke and was cheered by the delegates. Kay and the other defendants were booed. During the meeting, while a delegate was waiting to speak at a floor microphone, one of the defendants ran off the platform and grabbed the microphone from the delegate. The delegate wrestled the microphone back from the defendant and denounced him.
 
 
 10
 On September 10, 1987, Johnson and the other officers of the union attended the Guild Division Delegate Assembly, at which approximately two hundred people were present. Johnson spoke at the meeting. Immediately after she finished answering a question, a fuse blew and the microphones went dead. Johnson stepped off the stage and continued to address the delegates. While she was speaking, one of the defendants jumped off the stage and approached her. Delegates pushed toward the defendant, who had to be pulled back onto the stage by the other officers. Next, while delegates remained crowded close to the stage, another defendant jumped off the stage and charged at a delegate. The delegate stood his ground. The defendant returned to the stage, then jumped off again and moved menacingly toward the same delegate. The other union officers had to restrain the defendant physically from assaulting the delegate. Shortly thereafter, the police arrived. Johnson asked them to leave, explaining that though the meeting was loud, the police were not needed.
 
 
 11
 In early September, the Executive Council initiated action on extensive amendments to Local 1199's constitution. If approved, these amendments would substantially decrease the power of the President while increasing the power of the Executive Council. Johnson opposed these amendments.
 
 
 12
 Since becoming President of Local 1199, Johnson has published a column in the union's monthly newspaper, the Local 1199 News. On Tuesday, September 8, 1987, Johnson had a copy of her column for the September issue of the Local 1199 News delivered to the office of the appointed staff member who was the editor of the paper. Attached to the column was a memorandum directing the editor to print the column exactly as Johnson wrote it, in English and Spanish, on the first and last pages of the newspaper. However, the editor had not been in her office all week, and on Wednesday, September 9, Johnson also sent a copy of the column to the editor's house, but was informed that it could not be delivered because no one was home.
 
 
 13
 On Thursday, September 10, another copy of the column, along with a memorandum directing that the September issue of the newspaper containing the column be issued forthwith, was placed under the editor's office door. On Friday, September 11, Johnson received copies of eight resolutions that had been passed by the Executive Council on September 10, 1987. In "Resolution # 5," the Executive Council asserted its exclusive control over the Local 1199 News. This Resolution specifically stated that it was the sole authority of one of the defendant officers to determine the content of the paper insofar as proposed changes to the Local's constitution were concerned.
 
 
 14
 The other seven resolutions, enacted by the Executive Council on September 10, 1987, effected the following: (1) granted the Executive Council, rather than the President, the authority to convene Executive Council meetings; (2) granted the Executive Council, rather than the President, the authority to bring lawsuits and legal proceedings on behalf of Local 1199; (3) granted the Executive Council authority to retain on the staff and on salary any Local 1199 staff employee who was terminated by the President pending an internal hearing on the termination; (4) instructed the union's counsel to realign Local 1199 as a defendant in the lawsuit filed by Johnson and the five other union members on September 8, 1987; (5) instructed that there shall be no change in the existing signatures on Local 1199 bank accounts; (6) directed that members of the law firm retained by Johnson may not present themselves to any union employees or service provider as representing Local 1199 and may not enter Local 1199 for the purpose of directing or interfering with the work of any union officer or staff member; and (7) rescinded Johnson's decisions concerning Local 1199's participation in the National Union of Hospital and Health Care Employees' convention and concerning the role of one of that union's officers in Local 1199.
 
 
 15
 On September 11, 1987, the Executive Council passed another resolution barring admittance to the Local's building to anyone during the hours the building is closed. They also directed a security firm to carry out this policy over the weekend of September 12-14, 1987, granting authority over the use of the building to four Executive Council members and two staff employees but not to Johnson. The security firm was also informed that as of Monday, September 14, 1987, the firm was to take instructions from Ed Kay only and to guard him at all times. The next day, the First Amended and Supplemental Verified Complaint was filed.
 
 
 16
 B. Procedural History and Other Developments
 
 
 17
 Johnson and the defendants have engaged in protracted legal proceedings. Accompanying the original complaint was an Order to Show Cause seeking an order enjoining Kay and the other defendants from interfering with union members' ability to speak at meetings to be held that night and the next few nights. Consideration of the injunction application was adjourned to September 21. On September 15, a law firm filed an Order to Show Cause on behalf of Local 1199, seeking to realign Local 1199 as a defendant. Accompanying the First Amended and Supplemental Verified Complaint, summarized supra, also filed September 15, was an Order to Show Cause seeking a temporary restraining order enjoining the defendants from exercising control over the Local 1199 News and over the union's staff and from otherwise usurping Johnson's constitutional powers. Plaintiffs also moved for a preliminary injunction enjoining defendants from actual and threatened violations of Section 101(a)(1) and (2) of the LMRDA and from actual or threatened violations of the union's constitution. That same day, the original defendants, joined by all but one of the remaining members of the Executive Council, filed an answer and counterclaim to the original complaint. Accompanying the answer and counterclaim was an Order to Show Cause seeking to enjoin Johnson from cancelling Executive Council meetings. The next day, September 17, Johnson moved to disqualify the law firm representing the defendants.
 
 
 18
 After taking evidence and hearing argument, the district court issued an opinion from the bench striking Local 1199 as a party-plaintiff but denying its motion to intervene as a party-defendant, thus taking the Local out of the action altogether. It also disqualified the firm representing Kay and the other defendants on the ground that in its capacity as general counsel to Local 1199 the firm had received communications from Johnson on an issue substantially identical to an issue before the court. Johnson v. Kay, 671 F.Supp. 268, 270 (S.D.N.Y.1987).
 
 
 19
 At the hearing, the issue of the President's right to communicate with union members was also raised with regard to both the Local 1199 News and the mailings by the Executive Council to union members in support of the proposed constitutional amendments. Johnson sought to vindicate her "right to communicate" with union members by having Local 1199 pay for equivalent mailings for Johnson. While this issue was pending, the President of the RWDSU, acting on charges brought by Johnson, temporarily suspended Kay from his position as Secretary-Treasurer of Local 1199. The law firm which initially had sought to represent Local 1199 immediately sought an ex parte temporary restraining order staying Kay's suspension. Meanwhile, Local 1199 filed yet a new action, Local 1199, Drug Hospital and Health Care Employees Union, RWDSU, AFL-CIO v. Retail, Wholesale and Dep't Store Union, AFL-CIO, 671 F.Supp. 279 (S.D.N.Y.1987) (hereinafter "Local 1199 v. RWDSU "), Johnson v. Kay, 671 F.Supp. at 270, that was referred to Judge Sweet as a matter related to Johnson v. Kay. He then granted the temporary restraining order staying Kay's suspension. Johnson then moved to intervene, which was denied with leave to renew. Id.
 
 
 20
 At a hearing concerning Johnson's claim that the union should pay for a mailing, the defendants, while denying that Johnson had a right to such a mailing at union expense, nevertheless offered to send out a mailing containing two leaflets, one by the Executive Council in favor of the amendments, one by Johnson in opposition. Ruling from the bench, Judge Sweet granted Johnson a preliminary injunction requiring the union to pay for a mailing "reasonably equivalent" to mailings already undertaken by the defendants. The district court held that while there was "no direct preexisting federal "authority" for the relief sought by Johnson, the "logical extension" of previous case law under Section 101(a)(1) and (2) and Section 2(c) of the LMRDA required the union to pay for a mailing under the "peculiar circumstances" of the case. Alternatively, the court found that the union's constitution also gave Johnson such a right. Johnson was required to post a $40,000 bond. The district court also informed the parties that he was referring the case to a special master. Immediately assigned to the master was the supervision of the mailing.
 
 
 21
 On September 25, a stipulation was entered by the court "resolving the disputes over the alleged intimidation at meetings that had originally been at the heart of the case." Johnson v. Kay, 671 F.Supp. at 270. That same day, the September issue of the Local 1199 News finally appeared, complete with Johnson's column exactly as she had written it, covering approximately one-half page. Defendants, however, had added three pages of their own, attacking Johnson and advocating the amendments. Id. at 273.
 
 
 22
 During various hearings in September, Judge Sweet had informed the parties that he would be out of the jurisdiction between September 25 and October 1, 1987. He encouraged them to meet with the special master during this time and to restrain themselves from bringing any more applications. Several meetings with the special master did take place, but four additional Orders to Show Cause were also filed, three with the Part I judge and one with the special master. On October 1, briefs were submitted and argument was heard on what was now deemed the central issue in the case, the propriety of the procedures used by the Executive Council to initiate the proposed amendments to Local 1199's constitution. Johnson moved orally to enjoin the election, and Kay agreed to argue the issue immediately. Argument was also heard on the issue of converting the temporary restraining order issued in Local 1199 v. RWDSU to a preliminary injunction. Id. at 270. Decision was reserved in both cases to give the special master a chance to bring about a settlement. Id. at 270-71. These efforts failed.[2]
 
 C. The District Court's Decision
 
 23
 In his opinion of October 8, 1987, Judge Sweet distilled from Johnson's claims a number of issues concerning the proposed amendments to Local 1199's constitution. After reciting the standard for injunctive relief, he found against Johnson on all but the claim that the Executive Council's control of internal union communication facilities had effectively silenced Johnson in violation of the current constitution. As noted above, this claim had already been the subject of an oral ruling and order.
 
 
 24
 He found, however, that changing circumstances and the fuller factual record required a broader remedy than the single mailing ordered in September. Johnson v. Kay, 671 F.Supp. at 279. In a new order, Judge Sweet established a schedule of mailings for both Johnson and the Executive Council to be paid for by the union and prohibited any other mailings or the use of the services of union-paid staff by either side. Id. Although the defendants brought this appeal from that order, the mailings were sent out as required by the preliminary injunction, and the referendum was held under the supervision of the American Arbitration Association and the special master. The proposed amendments were adopted by majority vote.
 
 
 25
 We are informed by the parties that Johnson has petitioned the district court to set aside this vote on the grounds that the injunction was violated by defendants and to hold a new referendum.
 
 DISCUSSION
 A. Jurisdiction
 
 26
 We first decide whether the complaint states a federal claim justifying the assertion of pendent jurisdiction over Johnson's state claims. Appellants assert that their complaint stated claims cognizable under Secs. 101(a)(1) and (2) of the LMRDA, 29 U.S.C. Sec. 411(a)(1) and (2), and that jurisdiction is proper under Sec. 102 of the LMRDA, 29 U.S.C. Sec. 412, or under Sec. 301 of the LMRA, 29 U.S.C. Sec. 185. Because jurisdiction exists under Sec. 102 of LMRDA, we do not discuss Sec. 301 of the LMRA as an alternative basis of jurisdiction.
 
 
 27
 Whether jurisdiction under Sec. 102 of the LMRDA is proper depends on whether there is a viable allegation of an infringement of rights protected by the LMRDA. Section 101(a)(1) and (2) of the LMRDA is intended to ensure that unions use democratic processes. To that end, they grant every member of a labor organization equal rights to participate in the organization and rights of freedom of speech and assembly, specifically including the right "to express any views, arguments, or opinions ... at meetings ... upon any business properly before the meeting, ..." Sec. 101(a)(2), 29 U.S.C. Sec. 411(a)(2). These statutory rights of association and expression, however, are accorded only to union members acting as members and not to union officers acting solely in their official capacity as officers. Finnegan v. Leu, 456 U.S. 431, 436-37, 102 S.Ct. 1867, 1870-71, 72 L.Ed.2d 239 (1982). An allegation that an officer has been deprived of rights as an officer is thus insufficient to establish jurisdiction.
 
 
 28
 Notwithstanding the limitations on the scope of the LMRDA articulated in Finnegan v. Leu, an attack largely focusing upon a union officer may, under some circumstances, "directly threaten the freedom of members to speak out," Cotter v. Owens, 753 F.2d 223, 229 (2d Cir.1985), and therefore violate the LMRDA, where "as a result of established union history or articulated policy" there is "a deliberate attempt by union officials to suppress dissent within the union." Schonfeld v. Penza, 477 F.2d 899, 904 (2d Cir.1973). We conclude that the allegations of the present complaint meet this test.
 
 
 29
 Defendants and Local 1199 as amicus curiae stress that most of the allegations of the complaint relate solely to Johnson acting in her official capacity as President of the union and that the other named plaintiffs are never mentioned after their initial listing in the complaint. They also argue that for the most part the allegations involve the unplanned actions of individual defendants over a short period of time largely against non-plaintiffs and do not establish a history or articulated policy of the Executive Council to suppress dissent. We disagree.
 
 
 30
 Some paragraphs of the complaint do describe seemingly individual actions of various defendants. Paragraph 29 thus alleges that a defendant attempted to assault Johnson and her executive assistant at an Executive Council meeting. Paragraph 30 in turn describes Kay as storming into Johnson's office and threatening to burn Local 1199's headquarters to the ground before he would relinquish control of the union's building. However, several other paragraphs explicitly allege organized attempts by the defendants to prevent union members sympathetic to Johnson from expressing their views. For example, paragraph 31 alleges that, in an "incident ... planned and directed by Kay and the other defendants," thirty-five organizers and staff members invaded an Executive Council meeting and stood about glaring at Johnson. Although these intruders refused to leave at Johnson's request, they left upon Kay's orders. Paragraphs 32 and 33 allege that Kay and the other defendants "schemed and plotted" to disrupt Delegate Assembly meetings, the only available method other than election for office for union members to participate directly in union decisionmaking, by having members not entitled to come to the meetings crowd the microphones to prevent any Johnson supporters from addressing the meetings.
 
 
 31
 Several other paragraphs allege execution of this scheme to suppress dissent within the union. Paragraph 36 thus describes a Delegate Assembly meeting during which one of the defendants ran off a platform and grabbed a microphone away from a delegate about to speak. Paragraphs 41 and 42 describe another Delegate Assembly during which one defendant jumped off the stage and started to approach Johnson while she was speaking and another "charged" and "moved menacingly" toward a delegate and had to be restrained from assaulting him.
 
 
 32
 In addition to relating the above instances of physical intimidation directed at Johnson and her supporters, the complaint describes a series of actions by the defendants designed to monopolize communication and power within the union, and to take physical control of the union building. Paragraphs 45 through 49 relate Johnson's inability to have her views presented in the Local 1199 News, and Paragraph 51 reprints a resolution passed by the Executive Council asserting the Council's complete control over the union newspaper. Paragraphs 60 through 67 relate the various steps taken by the defendants to assert total control over Local 1199's headquarters building.
 
 
 33
 These allegations of disruption and intimidation at Delegate Assembly meetings and the seizure of the union headquarters by the Kay faction clearly reflect more than random acts of individuals directed solely at Johnson as union President. Specific allegations of coordination and planning among the defendants are made. Moreover, the nature, intensity and extent of the defendants' scheme, including threats of physical harm directed at Johnson and the attempts to block her normal channels of communication with other members during the period before the vote on the proposed constitutional amendments, the planned disruption of District Assembly meetings designed to frustrate union members from supporting Johnson, and the seizure of the union building, would strongly tend to chill union members who desired to exercise their rights in a fashion disapproved of by the Kay faction. See Cotter v. Owens, 753 F.2d at 228 (under extreme circumstances, action against officer can be " 'a form of intimidation of the membership' " and affects members' LMRDA rights) (quoting Schonfeld v. Penza, 477 F.2d at 90); see also Sheldon v. O'Callaghan, 497 F.2d 1276, 1282 (2d Cir.) (finding jurisdiction under LMRDA where alleged officers breached their duty to conduct fair referendum on new constitution), cert. denied, 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974). Cf. Local 1199 v. RWDSU, 671 F.Supp. 279, 287-88 (S.D.N.Y.1987) (jurisdiction under LMRDA possibly available where Johnson's instigation of Kay's removal part of a purposeful and deliberate attempt to suppress dissent). The allegations thus state a claim under the LMRDA.
 
 
 34
 We also find no merit in defendants' argument that a finding of jurisdiction under the LMRDA on an intimidation or suppression of dissent theory does not justify the exercise of pendent jurisdiction over Johnson's "mailing claim." Pendent jurisdiction exists where state and federal claims "derive from a common nucleus of operative fact" and are related such that a litigant "would ordinarily be expected to try them all in one judicial proceeding." United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Such a "common nucleus" exists in the instant case.
 
 
 35
 Relying upon the allegations of the complaint and the facts disclosed during the hearings concerning preliminary relief, Judge Sweet concluded that relief under a state-law contractual basis was warranted because "the Executive Council ha[d] virtually monopolized the means of union communication," Johnson v. Kay, 671 F.Supp. at 277, and had otherwise taken control of the union so that the fairness of the impending constitutional referendum was being undermined. We believe it relatively clear that the seizure of control over the methods of internal union communication is intimately related to the LMRDA intimidation claim because the suppression of dissent and control of communication are both means used by the defendants in their campaign to seize power in the local. Judge Sweet did not, therefore, abuse his discretion by addressing Johnson's state law claims under the doctrine of pendent jurisdiction. See Gibbs, 383 U.S. at 726-27, 86 S.Ct. at 1139-40.
 
 B. Mootness
 
 36
 There remains a final jurisdictional issue not briefed by the parties but raised by this court during oral argument. The union has already paid for the mailing, and the referendum has already been held. We therefore must determine whether the appeal is moot. We believe it is not.
 
 
 37
 Presently pending before the district court is a motion seeking to set aside the referendum and to require another one on the grounds that defendants violated the injunction. At oral argument Johnson's counsel firmly asserted that if another referendum were to be scheduled, he would move for the same order again. We therefore conclude that there is at least a "reasonable expectation," Honig v. Doe, --- U.S. ----, 108 S.Ct. 592, 601-02 & n. 6, 98 L.Ed.2d 686 (1988), that defendants will be subjected to an identical order prior to the entry of final judgment in this particular case. Thus, the district court's preliminary injunction involves an issue "capable of repetition yet evading review," Southern Pacific Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911), which may properly be decided now. Cf. United States v. Haller (In re Ithaca Journal), 837 F.2d 84, 86 (2d Cir.1988) (live controversy despite fact that relief requested already granted where " 'it can reasonably be assumed' " party will be subject to another order and that this order will likely evade review) (citations omitted).
 
 
 38
 The Supreme Court in First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 reh. denied, 438 U.S. 907, 98 S.Ct. 3126, 57 L.Ed.2d 1150 (1978), addressed an analogous issue. In First National Bank of Boston v. Bellotti, a number of businesses challenged a state statute that restricted expenditures of corporate funds to influence voter referenda. By the time the case reached the Supreme Court, the referendum in question had been held. The Supreme Court declared that the case fell within that category of cases "capable of repetition, yet evading review." Id. at 774, 98 S.Ct. at 1414. The Court relied on the fact that the time between legislative action and submission to the voters was too short to allow complete judicial review and that similar referenda were likely to be proposed, and thus challenged, in the future.
 
 
 39
 Similar elements appear in the instant case. The district court was forced to act quickly because Local 1199's constitution required that amendments to the constitution be acted on within sixty days of their being proposed. Inasmuch as the remedy involved a series of mailings designed to give the union members time to absorb the opposing parties' positions, the actual time between the district court's order and its implementation was quite short. Moreover, the proceedings pending in the district court portend an identical mailing order.[3] The case is therefore not moot.C. Local 1199 as Indispensable Party
 
 
 40
 Judge Sweet struck Local 1199 as a plaintiff and refused to realign it as a party-defendant. Given the unusual circumstances of this case, that was an understandable decision, although we believe it was erroneous. Judge Sweet has before him the President of the union on one side of the litigation and all but one of the members of the Executive Council on the other. Because the ultimate question before Judge Sweet was the right to control Local 1199, it is logical to regard Local 1199 itself as a "neutral party" in this dispute. Cf. Fitzgerald v. Abramson, 89 F.Supp. 504, 508 (S.D.N.Y.1950) (court more inclined to conclude that union local not indispensable party because of allegations that local was "disabled from operating as a functioning organization as a result of the acts of the defendants").
 
 
 41
 Nevertheless, we believe Judge Sweet erred in refusing to join Local 1199 under Fed.R.Civ.P. 19(a). Rule 19(a) of the Federal Rules of Civil Procedure provides in pertinent part:
 
 
 42
 (a) PERSONS TO BE JOINED IF FEASIBLE. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.
 
 
 43
 Indispensable parties have been categorized as " '[a]ll whose interests will be affected by the decree, that is, all persons materially interested either legally or beneficially in the subject matter of the suit....' " Green v. Brophy, 110 F.2d 539, 541 (D.C.Cir.1940) (citation omitted). There is no doubt that the union, as an institution separate and distinct from its officers and members, has a vital interest, both financial and structural, in the outcome of this suit, and that this interest is not necessarily coextensive with the interests either of President Johnson or of the Executive Council. See Eads v. Sayen, 281 F.2d 791, 795 (7th Cir.1960); Olson v. Miller, 263 F.2d 738, 740 (D.C.Cir.1959); Fitzgerald v. Haynes, 241 F.2d 417, 419 (3d Cir.1957); cf. Smith v. Bader, 458 F.Supp. 1184, 1187 (S.D.N.Y.1978) (partnership indispensable party in action by limited partners against general partner because plaintiffs and defendants concerned with protecting own interests, which may not necessarily coincide with that of partnership). But see Fitzgerald v. Abramson, 89 F.Supp. at 508 (where possibility exists that final decree could be entered without affecting union's interest, union not indispensable party on motion for preliminary relief).
 
 
 44
 We do not believe, however, that the failure of the district court to allow Local 1199 to participate prior to the grant of preliminary relief requires either reversal of the injunction or dismissal of the complaint, because Local 1199 has suffered no prejudice. We may assume that Judge Sweet lacked the power to order Local 1199 as a non-party to pay the cost of Johnson's mailing. See Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 110, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968). But he had the power to achieve the same result by ordering the defendants to pay for the mailings in their official capacity, and it appears that the defendant officials and the union proceeded as if this had been done. The order of September 25, 1987, ordering the first mailing, directed that it be done "at the defendants' expense." Since the union was not then a party, its payment of the expenses of that mailing was a recognition that the direction to its officials to bear the expenses was a direction to do so in their official capacity, which, under the circumstances, imposed the financial responsibility on their union. Cf. Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878 (1985) (official of municipality). Moreover, Johnson's injunction bond will give Local 1199 the opportunity ultimately to recoup its expenditures under the preliminary injunction, but only after obtaining final judgment in its favor. See University of Texas v. Camenisch, 451 U.S. 390, 396, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981) (when injunctive aspects of case become moot on appeal of preliminary injunction, issue preserved by injunction bond generally not resolved on appeal from preliminary injunction but rather at trial on merits). We therefore direct the district court to join Local 1199 as a party, and to take whatever steps it deems necessary to assure the adequacy and independence of the union's representation in the proceedings.
 
 D. Abuse of Discretion
 
 45
 Defendants' jurisdictional attacks have required us to go into this case in far more detail than is common in an appeal from the entry of a preliminary injunction. We shall thus confine ourselves to the essentials in dealing with defendants' remaining contentions. The standard for the issuance of a preliminary injunction in this circuit is well-settled. The party seeking the injunction must show a risk of irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make a fair ground for litigation and a balance of hardships tipping in the movant's favor. See, e.g., McNeilab, Inc. v. American Home Prods. Corp., 848 F.2d 34, 37 (2d Cir.1988). Where, however, the grant of the preliminary injunction will give the movant essentially all the relief he seeks, the injunction is often deemed mandatory rather than prohibitory, and a somewhat higher standard is applied, under which the movant must show a substantial likelihood of success on the merits, rather than merely a likelihood of success. Abdul Wali v. Coughlin, 754 F.2d 1015, 1025-26 (2d Cir.1985). Defendants argue that the district court's order requiring the union to pay for the mailings and barring the use of paid union employees to campaign for the referendum gave Johnson all the relief she sought on her "mailing claim," and that therefore the district court erred in failing to apply this higher standard.
 
 
 46
 We disagree. Johnson's "mailing claim" was not the only claim before Judge Sweet, and he did not act solely on that claim. The intimidation claim was also an integral part of Judge Sweet's decision to order the mailings in question. Johnson had thus sought to enjoin the referendum on a variety of grounds, including charges that the Executive Council had unlawfully blocked her efforts to communicate her opposition to the amendments to the membership and that the Executive Council had wrongfully usurped her authority over paid union employees. Judge Sweet not only found that the referendum was properly initiated but also found that, on at least one of her claims--controlling communication within the local--Johnson did meet the usual standard for injunctive relief in this circuit.
 
 
 47
 Under those circumstances, Judge Sweet did not want to risk paralyzing the union by taking the extreme step of entering an injunction prohibiting the referendum itself. See 671 F.Supp. at 279. Instead, in the tradition of courts of equity, he sought to shape "appropriate" relief, see Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers v. Crowley, 467 U.S. 526, 538, 104 S.Ct. 2557, 2564, 81 L.Ed.2d 457 reh. denied, 468 U.S. 1224, 105 S.Ct. 19, 82 L.Ed.2d 915 (1984), which would equalize the contending parties' ability to communicate with the union membership. Mandatory injunctions, for which the higher standard is appropriate, are those that disturb the status quo by ordering affirmative relief, while prohibitory injunctions preserve the status quo. Abdul Wali, 754 F.2d at 1025-26. While the interim relief here was mandatory in the sense that the order required the union to expend funds it perhaps otherwise would not have spent, it actually only required the union to do what it should have done earlier--open channels of communication to dissenting views, including those of Johnson. Furthermore, it did not grant Johnson all the relief she sought, nor did it give her all the relief she would be entitled to if she prevails on the merits.[4] Judge Sweet was therefore not required to apply a higher standard for granting the injunction. See, e.g., Eng v. Smith, 849 F.2d 80, 82 (2d Cir.1988) (higher standard inappropriate where plaintiffs not granted all relief sought).
 
 
 48
 This leaves the final question of whether Judge Sweet abused his discretion in granting the preliminary injunction. Our lengthy recitation in connection with defendants' jurisdictional challenges obviates the need to repeat the salient facts here. Although he appears to have based his actions on a mixed federal-state law basis, we are satisfied that Judge Sweet's pragmatic approach to the peculiar and quite fluid situation before him was well within his power.
 
 
 49
 Article III Sec. 2(a) of Local 1199's constitution,[5] titled "Guiding Principles," provides: "The policy of the Local and its methods of operation shall be such as to facilitate and stimulate the broadest possible rank and file participation in the formulation and execution of the program of the Local and to encourage development of the most effective leadership." Subsection (b) of the same Article provides: "There shall be full respect for all differences of opinion, and all members shall have full freedom of expression." The President is expected to play an important role in informing the membership, and is charged, in Article VII Sec. (g), with the duty of "report[ing] to the Division Delegate Assemblies and the membership on behalf of the Executive Council." We agree with the district court that, where the Executive Council has seized control of the means of union communication, "[t]he duty of the President to report to the membership carries with it a necessary right of access to the means to report in a meaningful manner. As a member of the Executive Council on whose behalf she is reporting, the President, of course, has the power to report her own views as well of those of the majority." Johnson v. Kay, 671 F.Supp. at 277. Viewed in the full context of this case, protecting the President in the exercise of her right to communicate with the membership was also a useful antidote to the intimidating conduct of defendants, designed to chill the exercise of rights by Johnson's supporters. The relief granted by the district court was therefore tailored to promote an informed debate among union members, an end expressly favored by Local 1199's constitution, and cannot be considered an abuse of discretion.
 
 CONCLUSION
 
 50
 The order of the district court granting plaintiff preliminary relief is affirmed.[6] The district court is directed, however, to allow Local 1199 to intervene as a party under conditions that will assure the adequacy and independence of the union's representation.
 
 
 
 [1]
 Although there are seven named plaintiffs, six of the named plaintiffs are not mentioned in the complaint beyond the caption and introductory paragraphs describing who each is. Accordingly, we focus solely on plaintiff Johnson
 
 
 [2]
 Judge Sweet subsequently issued an opinion transforming his restraining order into a preliminary injunction enjoining the RWDSU from removing Kay from office. See Local 1199 v. RWDSU, 671 F.Supp. 279 (S.D.N.Y.1987)
 
 
 [3]
 The allegations presently before the special master are that defendants violated the preliminary injunction's prohibition of the use of union personnel during the referendum campaign. According to defendants, these allegations are being addressed in a civil contempt proceeding within which they cannot challenge the validity of the preliminary injunction. As they see it, the only defense to these proceedings is an order from the court of appeals reversing the original injunction
 We hesitate to rely upon this rationale for avoiding mootness. Because the claimed violations involve past acts by defendants, these proceedings may be in the nature of criminal rather than civil contempt. See United States v. Spectro Foods Corp., 544 F.2d 1175, 1182 (3d Cir.1976) (appellate courts must look to substance of order rather than its form to determine whether contempt is civil or criminal); cf. In re Three Grand Jury Subpoenas Dated January 5, 1988, 847 F.2d 1024, 1028 (2d Cir.1988) (imposition of sanctions serves important function of informing reviewing court whether contempt is civil or criminal). However, if these proceedings are for criminal contempt, an order from us reversing the preliminary injunction will have no effect because "[v]iolations of an order are punishable as criminal contempt even though the order is set aside on appeal or though the basic action has become moot." United States v. United Mine Workers, 330 U.S. 258, 294, 67 S.Ct. 677, 696, 91 L.Ed. 884 (1947) (citations omitted).
 
 
 [4]
 Johnson sought a preliminary injunction against the referendum and damages against the defendants in their individual capacities, a permanent injunction against the deprivation by defendants of plaintiffs' statutory and contractual rights, and a declaratory judgment declaring the constitutional referendum to have been improperly conducted
 
 
 [5]
 Under New York law, "A union's constitution and by-laws constitute a contract between the union and its members and define not only their relationship but also the privileges secured and the duties assumed by those who become members, unless contrary to public policy." Ballas v. McKiernan, 41 A.D.2d 131, 341 N.Y.S.2d 520, 522 (1973), aff'd, 35 N.Y.2d 14, 358 N.Y.S.2d 695, 315 N.E.2d 758, cert. denied, 419 U.S. 1034, 95 S.Ct. 517, 42 L.Ed.2d 309 (1974). In addition, the constitution contractually binds the officers of a union to act within the constitution's framework. Simoni v. Civil Service Employees Ass'n, 133 Misc.2d 1, 507 N.Y.S.2d 371, 377 (Sup.Ct.1986) ("[T]he board of directors [of the union] must conduct its management within the framework of the union's constitution and by-laws, which constitute a contract between it and the general membership.")
 
 
 [6]
 Defendants also argue that the preliminary injunction's prohibition of the use of paid union staff on union time to campaign for the referendum was a prior restraint upon the free-speech rights of union officers and members as guaranteed by the first amendment. According to defendants, "[a]t least since Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the expenditure of money for communications is a 'pure form of "expression" involving "free speech alone" ', which, therefore, is entitled to the highest protection under the First Amendment." Buckley v. Valeo and the other cases cited by defendants are inapposite. First, before a first amendment right to spend money for communicative purposes attaches, the money must belong to the person who is spending it. If this were not the case, whenever a party claimed entitlement to a specific fund of money and intended to use the money for expressive purposes, a court could not protect the fund long enough to resolve the dispute without infringing constitutional rights. Although a union may have first amendment rights, Consolidated Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 533-34 & n. 1, 100 S.Ct. 2326, 2330-31 & n. 1, 65 L.Ed.2d 319 (1980), there is no basis to conclude at this point that the defendants in this case have the right to control Local 1199's speech. We certainly may not assume that the Executive Council has a preexisting right to use these funds and staff, as that is precisely the central question still pending before the district court