**COMMUNICATIONS WORKERS OF AMERICA, DISTRICT ONE, AFL–CIO, Ronald E. Woods, Sandra Lara, Marie Petrie, Paulette Gilliam, and John Credaroli, Plaintiffs–Appellees,**

v.

**NYNEX CORPORATION, NYNEX Medical Expense Plan, New York Telephone Company, NYNEX Service Company, and Empire City Subway Company (Limited), Defendants–Appellants.**

No. 696, Docket 89–9077.

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1989.

Decided March 16, 1990.

888

Bettina B. Plevan, New York City (Ira M. Golub, Kevin G. Chapman, Proskauer Rose Goetz & Mendelsohn, New York City, Bernard Yaker, Elizabeth B. Flaherty, White Plains, N.Y., Saul Scheier, Beverly Gross, Michael Hertzberg, New York City, of counsel), for defendants-appellants.

Amy Gladstein (Martin Garfinkel, Gladstein, Reif & Meginniss, Gabrielle Semel, Dist. One Counsel, Communications Workers of America, District One, AFL–CIO, New York City, of counsel), for plaintiffs-appellees.

Before KAUFMAN, NEWMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

The instant dispute arose during a strike by 40,000 members of the plaintiff Communications Workers of America, District One, AFL–CIO ("CWA" or "Union"), and 20,000 other workers against defendants NYNEX Corporation, New York Telephone Company, NYNEX Service Company, and Empire City Subway Company (Limited) (collectively "NYNEX"). The striking employees were entitled to continuation coverage of medical benefits under the Consolidated Omnibus Budget Reconciliation Act of 1985, 29 U.S.C. §§ 1161–1168 (1982 & Supp. V 1987) ("COBRA") (amending Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1461 (1982 & Supp. V 1987) ("ERISA")). However, NYNEX acted to frustrate this coverage. The district court issued a preliminary injunction enjoining the defendants from failing to provide COBRA coverage and from telling health care providers whether employees had paid their COBRA premium. The injunction also required the defendants to notify the striking employees that they had the right to elect to receive continuation coverage that would be retroactive. Because we agree that the evidence was sufficient to support a finding of irreparable harm and a likelihood of success on the merits, we affirm. However, we substantially modify the preliminary injunction as noted below.

BACKGROUND

NYNEX and CWA have been parties to various labor agreements for many years, the most recent one being effective from August 10, 1986 through August 5, 1989. Pursuant to these agreements and in accordance with ERISA, NYNEX maintains the NYNEX Medical Expense Plan, which provides employees and their dependents with medical insurance coverage for both in-hospital and out-of-hospital expenses, including such expenses as nursing services, prescription drugs, chiropractic services, physiotherapy, ambulance service, and doctors' home and office visits.

Negotiations between the parties over a new collective agreement having failed, a strike began at midnight on August 5, 1989. On August 28, 1989, NYNEX notified the striking employees that it intended to terminate medical coverage effective September 15, 1989. Nevertheless, the striking employees were entitled, under COBRA and the accompanying regulations, see Treas.Reg. § 1.162–26, 52 Fed.Reg. 22,-716 (1987) (to be codified at 26 C.F.R. pt. 1) (proposed Apr. 6, 1987), to continued medical coverage. In particular, COBRA requires that group health plans grant "qualified beneficiaries," 29 U.S.C. § 1167(3), who would lose coverage because of a "qualifying event," 29 U.S.C. § 1163, the opportunity to elect to receive continuation coverage under the plan for 18 months following that event. See 29 U.S.C. § 1162; see generally COBRA, 29 U.S.C. §§ 1161–1168. In the instant case, the strike constituted such a "qualifying event" because it resulted in a "reduction of hours ... of the covered employee's employment," 29 U.S.C. § 1163(2).

Under COBRA, the qualified beneficiary must elect to receive continuation coverage within 60 days of the qualifying event or

the date of notice of such event to the beneficiary, whichever is later. *See* 29 U.S.C. § 1165(1). Because the NYNEX letter of August 28 notified the striking employees of the impending cancellation of coverage effective September 15, 1989, the employees had 60 days after September 15, or until November 14, 1989, to make a timely election under Section 1165(1) to receive COBRA continuation coverage.

COBRA permits health plans to require the timely payment of a premium for such continuation coverage. *See* 29 U.S.C. § 1162(3). However, COBRA requires a plan to "permit payment for continuation coverage during the period preceding the election to be made within 45 days of the date of the election." 29 U.S.C. § 1162(3); *see also* Treas.Reg. § 1.162–26, at Q & A–48(a), 52 Fed.Reg. 22,731 (stating that timely payment means payment made within 45 days after the election). COBRA also provides that continuation coverage will end on "[t]he date on which coverage ceases under the plan by reason of a failure to make timely payment of any premium." *See* 29 U.S.C. §§ 1162(2)(C). Although we find the statutory language somewhat tautological, the parties agree that Section 1162(2)(C) provides for retroactive termination of continuation coverage as of the date of the qualifying event or notice to the employee of the event if payment is not made during the grace period. The COBRA regulations support that view in stating that continuation coverage ceases on "the first day *for which* timely payment is not made." Treas.Reg. § 1.162–26, at Q & A–38, 52 Fed.Reg. 22,731 (emphasis added). Because payment during the grace period is in part "for" the preceding continuation coverage, the plain implication is that a failure to pay the premium voids coverage from the beginning of the continuation period.

To recapitulate, the scheme established by COBRA contemplates an affirmative election that triggers continuation coverage subject to retroactive termination in the event of failure to pay within the 45–day grace period. In the instant matter, therefore, the striking employees had a two-month window, from the time that NYNEX cancelled its insurance on September 15, 1989, until November 14, 1989, in which to elect continuation coverage. That continuation coverage would be retroactive to September 16 but would also be retroactively terminated if the employee did not pay the premium by the 45th day following election.

On September 1, 1989, CobraServ National Service Center ("CobraServ"), an agent for NYNEX, sent to the striking employees a four-page notice relating to medical benefits. The first page, entitled "Important Notice," contained a notation at the top stating that "IF YOU ARE ON STRIKE BENEFITS WILL TERMINATE ON 09/15/89." It also purported to advise the workers of their continuation rights:

> If you elect to continue coverage, if you pay your premium, and if you meet all other requirements explained on the enclosed information sheet, your continuation coverage period will begin on 09/16/89. Your right to elect continuation coverage expires on 11/15/89. Please read the enclosed information sheet.

The next two pages, entitled "Information Sheet To Accompany 'Continuation of Group Health Coverage Election Agreement (COBRA),'" stated that "[o]nce the election agreement is returned, the COBRA Continuation Coverage Administrator will bill the participants for any selected coverages[,]" but that "coverage will end ... if ... the participant fails to pay the required premium in a timely manner." Although the Information Sheet did not explain that coverage is retroactive, it referred the reader to the NYNEX Benefits Handbook for more information. The fourth page, the continuation agreement itself, contained an authorization to be signed by the worker:

> I agree to remit the full current premium cost to CobraServ by the specified due dates, and I understand that coverage is subject to cancellation if timely remittance of premiums is not made. I further understand that CobraServ will bill monthly for any selected coverages ... and that I am responsible for timely

payment regardless of whether or not I have received a bill.

In a small box in the lower corner of the agreement, the following appeared:

IMPORTANT: The amounts shown as premium rates ... will be due for the period from the date coverage(s) terminated or will terminate, to the end of the month in which we receive your completed form. Premiums are due within 45 days of this election.

The mailing and other actions by NYNEX apparently caused considerable confusion. First, the mailing that some workers received did not include the election form. Second, when workers telephoned the CobraServ office, CobraServ operators told them that they would not be listed as covered under COBRA unless they had completed the election form *and* the premium had been received. The Union attempted to rectify this confusion by sending a letter, dated September 9, 1989, to the striking workers detailing their rights, including the 45–day grace period, under COBRA.

Some striking workers who had elected continuation coverage nevertheless experienced difficulties in obtaining medical treatment. NYNEX took the position that, until the striking workers electing continuation coverage had actually paid the premium, they were not covered, and NYNEX so informed health care providers. CobraServ thus omitted from its weekly listing to providers of insured employees all employees who had elected continuation coverage but had not yet paid the premium. This created difficulties in obtaining medical treatment for striking workers who had elected continuation coverage but who had not yet paid the premium, even though the 45–day grace period had not expired.

On October 18, 1989, the Union brought the present action. It moved for a temporary restraining order and a preliminary injunction to prevent NYNEX from denying coverage to those striking workers who had elected continuation coverage. The district court held a hearing on October 19 and entered an order enjoining NYNEX the next day. That order was converted into a preliminary injunction by stipulation of the parties on October 23, 1989. The court waived the posting of security for the injunction.

The order incorporated the court's findings of fact and conclusions of law. It stated that NYNEX violated ERISA by "unlawfully conditioning the provision of COBRA continuation coverage to all qualified beneficiaries who timely elect such continuation coverage on the payment of the initial premium for such continuation coverage." Moreover, the court found that the plaintiffs and other qualified beneficiaries had suffered, and would continue to suffer, irreparable injury.

Accordingly, the court entered the following order:

[D]efendants are restrained from failing and refusing to provide COBRA continuation coverage to all qualified beneficiaries who timely elect such continuation coverage by conditioning the provision of such coverage on payment of any premium prior to the completion of the [45] day period for payment set forth in ERISA Section 602(3), 29 U.S.C. § 1162(3); and such continuation coverage must consist of coverage which is identical to the coverage provided under the Plan to similarly situated beneficiaries under the Plan with respect to whom a qualifying event has not occurred....

The court further required NYNEX to send a clarifying notice to all striking workers with the following language:

This is a correction notice, pursuant to Court Order, of the notice dated September 1, 1989 which was previously sent to you. You are hereby advised that upon execution and submission of an Election Agreement before November 14, 1989, you will immediately receive COBRA continuation coverage which will be effective retroactively to September 16, 1989.

You will have an additional 45–day period after submission of the Election Agreement to pay the initial premium (for coverage received between Septem-

ber 16, 1989 and submission of the Election Agreement).

All subsequent premiums for the continuous coverage received after submission of the election agreement will be billed to you and must be paid in accordance with the time provisions of the [P]lan if you wish to maintain your coverage.

Such coverage is identical to the coverage provided under the Plan to similarly situated beneficiaries under the Plan with respect to whom a qualifying event has not occurred.

The court also required NYNEX to notify CobraServ and insurers that a striking worker who has signed an election agreement is "immediately deemed to have COBRA continuation coverage, and that such coverage must be identical to the coverage provided under the Plan to similarly situated beneficiaries." The notices required by the district court omitted the information that a failure to pay the premium before expiration of the grace period would result in a retroactive termination of benefits. Finally, the court prohibited NYNEX from "advising any provider of health care whether or not a qualified beneficiary has paid the initial premium" after election of continuation coverage but before the 45-day period had elapsed. NYNEX appeals.

## DISCUSSION

■ We first address NYNEX's claim that plaintiffs have not satisfied the criteria for the issuance of a preliminary injunction. The issuance of a preliminary injunction requires the showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). As the appellant, NYNEX "bears the heavy burden of establishing that the trial court misapplied these accepted principles." *Arthur Guinness &*

*Sons, PLC v. Sterling Pub. Co.*, 732 F.2d 1095, 1099 (2d Cir.1984).

In this circuit, the threat of termination of medical benefits to striking workers has been held to constitute irreparable harm. In *Whelan v. Colgan*, 602 F.2d 1060, 1062 (2d Cir.1979), we stated that "the threatened termination of benefits such as medical coverage for workers and their families obviously raised the spectre of irreparable injury." In the present case, the district court found that the striking workers were exposed to the denial of medical coverage and that irreparable harm existed. The record supports that finding.

An affidavit from Sandra Lara, a named plaintiff and member of the Union's Defense Fund committee, detailed a number of instances in which strikers who had elected continuation coverage encountered difficulties in obtaining medical care from providers. NYNEX attacks this hearsay declaration as inadequate to support the grant of a preliminary injunction. However, Lara was the committee member responsible for all decisions regarding funds allocated to health care and was responsible for approving all requests for payment of medical bills and all elections of continuation coverage. She therefore was in a position to know of the problems the striking workers had faced. Moreover, Lara's statement was substantially supported by an affidavit from James MacDougald, chief executive officer of CobraServ's parent company. MacDougald stated that where a worker had elected coverage but had not paid the premium, persons who inquired about the worker's coverage would be told that "once a premium is received coverage is retroactive to the beginning of the COBRA continuation period." If the worker had not elected continuation coverage, the inquiring party would be told that the worker could "obtain insurance by electing coverage before November 15 *and* by paying the premium within 45 days" (emphasis added). CobraServ was thus strongly suggesting, if not expressly stating, to workers and providers that workers who had elected continuation coverage but had yet to pay the premium were not covered until the premium was

paid, at which time coverage would be retroactive. Such information was a misstatement that would inevitably create difficulties in obtaining care for such workers. MacDougald's affidavit thus corroborates Lara's affidavit.

Under *Whelan*, acts that result in a denial of covered treatment justify a finding of irreparable harm. NYNEX attempts to distinguish *Whelan* on the ground that it involved a complete termination or substantial reduction of benefits, whereas the present case does not involve such a termination or reduction. We disagree. By removing the striking workers from the list of covered employees it circulated to providers and by notifying workers and providers that they would not be covered until they had paid the premium, NYNEX caused the denial of benefits to the striking workers. The present case thus involves precisely the same effect on employees as existed in *Whelan*.[1]

We now turn to the second criterion for the issuance of a preliminary injunction, likelihood of success on the merits. As an ERISA trustee, CobraServ was obligated not to mislead either providers or beneficiaries as to the status of a particular worker's coverage. MacDougald's affidavit stated that CobraServ's practice was to inform whoever inquired that, as to those

employees who had elected continuation coverage but not yet paid, the employee would be retroactively covered when the premium was paid. Those who inquired were not told that continuation coverage was effective upon election and that a grace period for payment followed. That omission was misleading.

Moreover, quite apart from the admitted practice of CobraServ in responding to inquiries, the record contains other evidence supporting a finding of likelihood of success on the merits. The four-page notice sent to the striking workers on September 1 was at best misleading. Certainly, it did little to inform striking workers that they enjoyed a 60–day period during which to elect continuation coverage and that their election would in turn trigger a 45–day grace period for payment of the initial premium. The conspicuous notice that "BENEFITS WILL TERMINATE ON 09/15/89" implied that neither an election period nor grace period existed and, when combined with CobraServ's confusing explanations of the continuation coverage, lends ample support to the conclusion that the Union would likely succeed in showing an ERISA violation.[2]

We next address NYNEX's arguments that the remedy fashioned by the district

1. NYNEX also argues that the Union's delay until mid-October in seeking injunctive relief belies irreparable injury. This argument is meritless. The Union could not know of NYNEX's ERISA violation until after September 15, 1989, when COBRA continuation coverage became effective. Moreover, the violation was less than obvious until striking workers who had elected continuation coverage unsuccessfully sought medical treatment or until they were told by CobraServ that they were not covered until the premium was paid. In either case, the Union timely filed a grievance five days after the termination of the regular coverage on September 15, to which NYNEX apparently did not respond until two weeks later, on October 3, when it denied any obligation to enter into arbitration. Ten days later, the Union again asserted its right to arbitration, and another five days later, on October 18, it filed the complaint in this action and asked for injunctive relief. We fail to see why this course of events, which included prompt protests by the Union through collective bargaining processes, undercuts the claim of irreparable injury to striking workers.

2. NYNEX argues alternatively that its good-faith attempt to comply with the proposed regulations that accompany ERISA exempts it from a finding of an ERISA violation. NYNEX bases this claim on the preamble to the proposed regulations accompanying ERISA, which states in pertinent part that

   compliance with the terms of these proposed regulations [will] constitute good faith compliance with a reasonable interpretation of the statutory requirements.... In addition, the Internal Revenue Service will not consider actions inconsistent with the terms of these proposed regulations necessarily to constitute a lack of good faith compliance with a reasonable interpretation of the statutory requirements; whether there has been good faith compliance with a reasonable interpretation of the statutory requirements will depend on all the facts and circumstances of each case.

   Treas.Reg. § 1.162–26, 52 Fed.Reg. 22,716–17. However, NYNEX's notice to the striking workers and CobraServ's response to inquiries were so misleading as to negate any inference of good faith.

court is in part improper. In particular, NYNEX takes issue with the portion of the order that prohibits it from disclosing to health care providers whether a worker has paid the premium for continuation coverage, and with the portion that requires NYNEX to distribute to the workers a notice that omits the fact that failure to pay the premium will result in retroactive termination of coverage. Because we agree with NYNEX's arguments, we modify the order.

■ First, NYNEX argues that the portion of the order prohibiting it from "advising any provider of health care whether or not a qualified beneficiary has paid the initial premium" exposes NYNEX to litigation by health care providers. This issue concerns striking workers who receive covered care after electing continuation and during the grace period but fail ever to pay the initial premium. Because the failure to pay that premium terminates benefits retroactively, the statute renders the worker liable for the costs of any care received. If the provider cannot recover from the worker, however, NYNEX is concerned that the provider will look to it, NYNEX, for payment. The union scoffs at the idea that NYNEX might be liable to such a provider and notes that NYNEX fails to elaborate the legal theory on which that liability might be based. For its part, NYNEX is understandably reticent about admitting potential liability to providers or offering legal theories upon which such liability might be based. NYNEX thus states merely that it expects to be sued if providers are left with retroactively uncovered costs of care.

We do not address the respective obligations of providers and medical benefit plans because we believe that the district court's order must in any event be modified. The perceived difficulty with allowing NYNEX to give accurate information to providers about the payment of premiums during the grace period is the apprehension that providers will decline to care for workers where retroactive termination is a possibility. This apprehension may well be justified. At best, a provider giving care will encounter a protracted dispute with the particular plan regarding who bears the risk of unpaid bills resulting from retroactive termination. At worst, such a provider will find such care uncovered. However, the challenged provision of the injunction aggravates the problem it was designed to cure.

The statute, by providing a grace period and then retroactive termination upon non-payment, does expose providers to the risk of non-payment and thus creates incentives for providers to turn away workers during the grace period. This result seems at odds with the entire continuation mechanism that was designed to prevent gaps in coverage. The district court's order, however, may have an effect even more at odds with the legislative purpose. Under that order, NYNEX is not permitted to confirm that a particular employee has or has not paid the initial premium. This provision does not, however, eliminate the apprehension that providers will refuse care to workers who have not paid the premium. To the contrary, a prohibition on informing providers about the payment of premiums creates uncertainty with regard to all workers and thus provides a disincentive for health care providers to provide care to any striking worker, including those who have paid the premium. If anything, therefore, this remedy makes the situation worse. Permitting NYNEX to respond truthfully to questions from health care providers regarding payment of the initial premium will thus assist at least those who have paid the premium to obtain medical treatment while not additionally hindering those who have elected but have not yet paid.

Moreover, we are chary of approving an order that seems designed only to prevent non-parties to this litigation from acting to protect their interests on the basis of accurate information. The Union itself takes the position that providers bear the risk of costs for care that are unpaid because of retroactive termination. We believe that it cannot simultaneously seek to deprive such

providers of information they might consider relevant.[3]

Accordingly, in an unpublished order dated and effective December 13, 1989, we modified the district court's order as follows. The final paragraph of the preliminary injunction issued October 20, 1989, was deleted and the following was substituted:

IT IS FURTHER ORDERED that defendants and their agents, prior to the expiration of the forty-five (45) day period following execution of the election agreement, shall be entitled to advise any provider of health care whether or not a qualified beneficiary has paid the initial premium and shall, in the course of furnishing such advice with respect to any beneficiary for whom a premium has not been paid, inform the provider that, upon payment of the premium, coverage will be available retroactive to September 16, 1989.

We now turn to NYNEX's claim that the notice NYNEX must distribute to the striking workers under the order improperly omits the fact that failure to pay the premium will result in retroactive denial of coverage. We agree with NYNEX that this omission will lead some striking workers to infer that their claims will be paid even if they fail to pay the initial premium within 45 days after electing continuation coverage. There is no legitimate reason for omitting this information. Omission of information about the possibility of retroactive termination in no way remedies the misleading notices sent to strikers by NYNEX. It only increases the confusion. Although the Union maintains that the notice mandated by the court is not inaccurate and is more detailed than the Model Notice promulgated by the Secretary of Labor in ERISA Technical Release 86–2,

June 26, 1986, *reprinted in* Pens. Plan Guide (CCH) ¶ 6999C, this does not answer the argument that the notice is nevertheless incomplete. However, the strike has ended, and the 45–day grace period has long since expired. The principal need for notice at this time, therefore, appears to be with regard to those workers who did not return to NYNEX and failed to pay the premium within the grace period. If notice to such workers is believed necessary by any party, the form of such notice, in the absence of agreement, shall be resolved by the district court upon application made promptly after issuance of our mandate.

In view of our modifications of the preliminary injunction to permit NYNEX to provide accurate information to health care providers regarding payment of the initial premium and to striking workers concerning possible retroactive termination of benefits, we need not reach NYNEX's claim that the injunction violates its rights under the First Amendment.

We turn finally to NYNEX's argument that the preliminary injunction grants mandatory and final relief and is therefore improper. The argument fails. To the extent that the injunction grants "mandatory" relief, it does so only to rectify the confusion brought about by NYNEX's misleading statements as to continuation coverage. Therefore, it is permissible under well-accepted principles of preliminary injunctions. *See Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir.1988); *SCM Corp. v. Xerox Corp.*, 507 F.2d 358, 361 (2d Cir. 1974).[4]

Affirmed as modified. Each party shall bear its own costs.

---

3. In the context of medical treatment by a health maintenance organization ("HMO"), the manner of medical coverage chosen by 12,000 of the striking workers, proposed regulations seem to permit the HMO to require prepayment for medical services when election *and* payment have not been established. *See* Treas.Reg. § 1.162–26, at Q & A–34(c), 52 Fed.Reg. 22,730.

4. Accordingly, we reject NYNEX's argument that the posting of a bond should have been required. Our modification of the injunction eliminates any potential liability of NYNEX to providers resulting from a failure to convey accurate information concerning payment of premiums, and the district court's waiver of the bond is harmless. *See Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 632 (2d Cir.1976); *Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir.1961).