Georgianna JOHNSON, et al., Plaintiffs,

v.

Edward KAY, et al., Defendants,

Local 1199, Drug, Hospital and Health Care Employees Union, RWDSU, AFL–CIO, Intervenor.

No. 87 Civ. 6482 (RWS).

United States District Court, S.D. New York.

July 13, 1990.

---

Gary Sinawski, New York City, Bernstein & Lipsett, Washington, D.C. (Jules Bernstein, of counsel), for plaintiffs.

Gladstein, Reif & Meginniss, New York City (James Reif, of counsel), Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P.C., New York City (Victor Rabinowitz, of counsel), Sipser, Weinstock, Harper & Dorn, New York City (Richard Dorn, of counsel), O'Dwyer & Bernstein, New York City (Paul O'Dwyer, of counsel), for defendants.

## OPINION

SWEET, District Judge.

Plaintiff Georgianna Johnson ("Johnson") and certain other members of Local 1199, Drug, Hospital and Health Care Employees Union RWDSU AFL–CIO (the "Union" or "1199") (collectively "Johnson") have moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The defendants Edward Kay and certain officers of the Union and members of the Executive Council of the Union (collectively the "Executive Council") have also moved for summary judgment dismissing this action. In addition, Johnson has moved for an award of counsel fees and the Executive Council has moved for sanctions. It is hoped that the resolution of the pending motions will terminate this bitter, intra-union dispute, the significance of which is now principally a matter of history.

Kay's motion for summary judgment is granted, Johnson's motion for partial summary judgment is denied, the action is dismissed, counsel fees are awarded, and sanctions are denied.

### The Parties And Their Present Posture

Upon remand pursuant to the direction of the Court of Appeals, the Union was made a party to this proceeding and on August 9, 1989 independent counsel for the Union was appointed. The Union is the largest local in the United States, some 80,000 members strong. Its officers perform significant roles in the Union and in political life in the community and state elections. Its economic power is recognized and prized. Its recent history has been marked by intense internal conflict.

Georgianna Johnson, a member of 1199, started her career as a union official by running as a part of a slate in 1986 to overturn Doris Turner, the then president of 1199 in an election supervised by the Department of Labor. She was elected as were the individual defendants who became officers of 1199 and members of the Executive Council of the Union.

By the summer of 1987, Johnson and the Executive Council had developed different positions on a variety of issues affecting 1199. The Executive Council on September 4, 1987 proposed amending the Constitution which had been adopted in 1985, in part in Johnson's view, to restrict her powers. Johnson initiated this action on September 8 to preserve her rights in connection with the Executive Council's procedures.

As more fully described below, the Constitution was amended by referendum and thus adopted as amended on November 14, 1987. Johnson sought to amend the Constitution through the action of the General Delegate Assembly which was held on March 23, 1988, to restore certain of her powers. According to the Executive Council, these amendments were not properly before the Assembly and were not adopted.

In April 1989 in a regularly scheduled election of Union officers, Georgianna Johnson was defeated in her bid for reelection as Union President, by a vote of 19,747 for Dennis Rivera to 2,026 for Johnson. Defendant Kay was elected an Executive Vice–President as were defendants Marshall Garcia, Jarrett, Hughley, Abelson and Aida Garcia. Defendant Grant–Gutierrez was elected Vice President for Organizing. Defendants Yearwood, Doyle and Mayfield were each elected Area Vice–Presidents.

Each of the officers was sworn into office on or about May 1, 1989, by Lenore Miller, President of the Retail, Wholesale & Department Store Union, AFL–CIO, the international labor union with which Local 1199 is affiliated.

On June 14, 1989, Johnson moved from Brooklyn, New York to Philadelphia, Pennsylvania, where she now resides.

As President of 1199 Dennis Rivera does not wish to pursue any of the claims in this case which involve an assertion that one or more defendants acted to interfere with the President's exercise of presidential rights, powers or authority under the 1199 Constitution or otherwise acted unlawfully vis-a-vis the President as President.

### Prior Proceedings

This action was commenced on September 7, 1987 and by order to show cause Johnson sought to enforce a referendum

seeking to amend the Constitution of the Union.

By a decision dated October 8, 1987, the Union was directed to pay the expense of two mailings containing Johnson's objections to the proposal to amend. *Johnson v. Kay,* 671 F.Supp. 268 (S.D.N.Y.1987).

A Special Master, the Honorable Eric Schmertz, then Dean of Hofstra Law School, was appointed to supervise the referendum and discovery.

On October 26, 1987, the Special Master signed a Memorandum and Order summarizing the discussions of the parties and the agreements reached and "based upon the consent of all parties," directing that (a) the referendum be conducted by mail ballot under his supervision and (b) directing that the meeting scheduled by Johnson for November 5 be postponed and that no Delegate Assembly meeting be held prior to November 23, 1987. Later that same day, "[b]ased upon the parties' consent," this court adopted the Memorandum and Order of the Special Master "in its entirety."

The mail ballot referendum was conducted by the American Arbitration Association and completed on November 14, 1987.

Johnson sought a stay of the effectiveness of the newly adopted Constitution pending a ruling on a challenge by Johnson to the legality of its adoption which was denied by the Special Master on November 18. No review of that ruling was sought.

An evidentiary hearing on Johnson's application to nullify the result of the referendum was conducted by the Special Master over three days in April 1988. No review of that ruling was sought.

By service of a summons in December 1987, Johnson also sought to bring criminal charges against Kay for assault and harassment based upon the same alleged incident on October 8, 1987. The District Attorney of New York County assigned three Assistant District Attorneys to an investigation of Johnson's allegations. After completion of that investigation, the District Attorney moved to dismiss the charges against Kay for lack of evidence. That motion was granted on August 10,

1988. *People v. Edward Kay,* Docket No. 7N119658 (New York County).

On February 4, 1988 an order was entered granting preliminary injunctive relief to Johnson relating to the adjourned General Delegates Assembly and directing that all disputes relating to that meeting be heard by the Special Master.

On June 16, 1988 a motion by defendants to dismiss the complaint for lack of jurisdiction was denied and on October 25, the Court of Appeals affirmed the 1987 injunctions and directed that the Union be made a party and represented by special counsel.

The instant motions were initiated in January 1990 and adjourned by agreement of the parties. The summary judgment motions were heard and submitted on February 9, 1990 and the counsel fees and sanctions motions were heard and submitted on April 20, 1990.

*The Absence Of Factual Dispute*

Given the extensive litigation to date and the application of *res judicata* and estoppel, *see Gelb v. Royal Globe,* 798 F.2d 38, 44 (2d Cir.1986), certain facts sufficient to the determinations which follow have been established by the record to date and remain undisturbed by the evidence presented on these particular motions.

*Standards For Summary Judgment*

To grant summary judgment the court must determine that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court's responsibility is not to resolve disputed issues of fact, *Donahue v. Windsor Lock Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir. 1987), but to determine whether there are any factual issues to be tried, while resolving ambiguities and drawing inferences against the moving party. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (citing *Adickes v. S.H. Kress & Co., Inc.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)). Summary judgment enables the court to dispose of meritless claims before becoming entrenched in a costly trial. *Donahue,* 834 F.2d at 58, (cit-

ing *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987)).

*Johnson Is Not Entitled To Partial Summary Judgment*

Johnson seeks partial summary judgment on four claims:

   a. Kay allegedly interfered with Johnson's efforts to communicate with Local 1199 members concerning her opposition to the proposal to amend the Union's 1985 Constitution and thereby violated the Union's Constitution and Sections 101(a)(1) and 101(a)(2) of the Labor–Management Reporting & Disclosure Act of 1959 ("LMRDA"), Title 29 U.S.C. §§ 411(a)(1) and 411(a)(2);

   b. Kay allegedly interfered with Johnson's effort to call a meeting of the Union's General Delegate Assembly and thereby violated the Union's Constitution and LMRDA Sections 101(a)(1) and 101(a)(2);

   c. Kay usurped Johnson's powers under the Union Constitution by adopting eight resolutions dated September 10, 1987; and

   d. Kay caused the Union's headquarters to be closed on Saturday, September 19, 1987, and thereby interfered with Johnson's powers under the Local 1199 Constitution and her rights under LMRDA Section 101(a)(2).

Johnson also seeks reargument of the submission to Local 1199's membership of a package proposal to amend the Union's Constitution violated LMRDA Section 101(a)(1).

Three of the five claims in Johnson's motion, two of which are moot, have been disposed of by the court. The court has already remedied what it believed was an improper interference with Johnson's right to communicate to the membership her opposition to the proposal to amend the Constitution. In its October 8, 1987 opinion, *Johnson v. Kay*, 671 F.Supp. 268, 272–73 (S.D.N.Y.1987), the court found that by "virtually monopoliz[ing] the means of union communication" the defendants had violated the obligation imposed by the Constitution on President Johnson to report to the membership and the right conferred on the general membership by the Constitution to "hear adequate debate," 671 F.Supp. 268, 277.

In addition, the October 8, 1987 opinion stated that "... the issue goes beyond the obligations imposed by the LMRDA to the contractual rights between Local 1199's President and the Executive Council," and determined that "Johnson's contractual right to report in a meaningful way has been infringed" and that the defendants had violated the general membership's contractual right to hear acts which also infringed the equal rights and privileges of the plaintiffs and other members of Local 1199 to vote in the Constitutional referendum, in violation of LMRDA § 101(a)(1), 29 U.S.C. § 411(a)(1) and the rights of plaintiff and other members of Local 1199 to express views or opinions, in violation of LMRDA § 101(a)(2), 29 U.S.C. § 411(a)(2).

Johnson was provided with a "meaningful opportunity to put forth [her] position [ ]" before the referendum on the proposal to amend was conducted and provided "a chance to speak at approximately the same volume" on the proposal as the Union's Executive Council. *Johnson v. Kay*, 671 F.Supp. 268, 279 (S.D.N.Y.1987). Prior to the balloting on the proposal, Johnson mailed to the membership at Union expense two leaflets advocating rejection thereof, one 16 pages long and the second 8 pages long.

By memorandum dated September 17, 1987, Johnson scheduled a meeting of the General Delegate Assembly for November 5, 1987. *Johnson v. Kay*, 671 F.Supp. at 272. In accordance with the opinion of October 8, 1987, a preliminary injunction was entered directing that the voting at the General Delegate Assembly proceed.

The Special Master's Memorandum and Order dated October 26 provided:

   ORDERED, that the General Delegate Assembly currently scheduled for November 5, 1987, shall be postponed and that Local 1199 shall not hold or conduct any General Delegate Assembly or any

Division Delegate Assembly until no earlier than November 24, 1987.

The court's endorsement of this Memorandum and Order, also dated October 26, 1987, provided:

Based upon the parties' consent, the Memorandum and order of the Special Master, dated October 26, 1987, is hereby adopted in its entirety by the Court subject to leave to apply to the Court for a modification based upon a change of circumstances.

The meeting was rescheduled for November 24, 1987, and Johnson sought to proceed with the meeting, only to have it cancelled by the Executive Council. After the Executive Council refused to pay for the hall, the Special Master directed such payment and an injunction was issued on February 4, 1988 on a finding of irreparable injury, stating:

In sum, Johnson has asserted irreparable injury. Moreover, the LMRDA prohibits one union faction from infringing on the free speech rights of another, hereby disallowing Johnson the right and the duty she has to communicate with the delegates representing the entire union membership. [citation omitted].

By seeking to thwart Johnson's attempts to convene a General Delegate Assembly and to communicate with the Union's membership, defendants violated LMRDS Secs. 101(a)(1) and (2), 29 U.S.C. § 411(a)(1) and (2) and breached Article VII of the Local 1199 Constitution.

The court already has remedied the interference with Johnson's attempt to call a meeting of the General Delegate Assembly. By order dated February 10, 1988, it required the Union to pay for the rental of a theatre for such a meeting, which meeting was then held at the place and on the date set by Johnson.

Johnson also places before the court again that the Executive Council violated the rights of union members to a meaningful vote in violation of § 101(a)(1) of the LMRDA, 29 U.S.C. § 411(a)(1), by presenting all of the proposed amendments to the Union Constitution in a single block.

At the time of the October 8, 1987 opinion this position was considered and rejected. No additional facts or authorities have been presented to require a change in the earlier determination. Johnson again relies upon *Sertic v. Cuyahoga, Lake, Geauga & Ashtabula Counties, C.D.C.,* 423 F.2d 515 (6th Cir.1970).

However, *Sertic* was a challenge to a referendum on a proposed dues increase brought solely under LMRDA § 101(a)(3). By contrast, the referendum challenged in the present case did not involve a proposal to increase members' dues and the claim is brought solely under § 101(a)(1).

Section 101(a)(3), 29 U.S.C. § 411(a)(3), affirmatively created and guaranteed the right of members of a local union to vote on a proposed dues increase. The *Sertic* Court sought to maintain the integrity of this federal right, by holding that a vote on a dues increase should not be influenced by a member's view on some arguably unrelated matter.

In contrast to § 101(a)(3), § 101(a)(1) provides that where members elsewhere have been given the right to vote on an issue, the union may not unreasonably discriminate against members in their exercise of that vote:

Plainly, [Section 101(a)(1)] is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote.

*Calhoon v. Harvey,* 379 U.S. 134, 139, 85 S.Ct. 292, 295, 13 L.Ed.2d 190 (1964).

In *Gurton v. Arons,* 339 F.2d 371 (2nd Cir.1964), the Second Circuit explicitly held that § 101(a)(1) did not guarantee a right to vote but only "equality in voting." *Id.* at 374. *Accord, Myers v. United Brotherhood of Carpenters,* 684 F.2d 225, 227 (2d Cir.1982); *Fritsch v. District Council No. 9,* 493 F.2d 1061, 1063 (2d Cir.1974).

Regardless of how unfair Johnson claims the package proposal to have been, it was not violative of her rights under § 101(a)(1). All union members were given the same opportunity to vote on that proposal. As in *Calhoon v. Harvey,*

[t]he complaining union members here have not been discriminated against in any way and have been denied no privilege or right to vote or nominate which the union has granted to others.

379 U.S. at 139, 85 S.Ct. at 295. In *Calhoon,* challenges were brought under § 101(a)(1) to a bylaw provision which deprived a member of the right to nominate anyone for office but himself and to a constitutional provision limiting eligibility for union office to those who had been union members for five years and who had satisfied certain seatime service requirements. *See also Myers,* 684 F.2d at 227 (union rule barring contracting members from voting applies to all members and hence does not discriminate in violation of § 101(a)(1)). Similarly, submission to all union members of the package proposal to amend did not subject plaintiffs to the discrimination prohibited by § 101(a)(1).[1]

Accordingly, reargument of the package proposal is denied.

*Article III Requires A Case Or Controversy*

Johnson is not entitled to a declaratory judgment with respect to any of her claims. The Article III case or controversy requirement applies to requests for declaratory relief. *Golden v. Zwickler,* 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1968). *See* 28 U.S.C. § 2201. Moreover, there must be an actual case or controversy now at the time of the court's consideration of plaintiffs' claims, not merely one when the claim was initiated.

The test for determining the existence of a live controversy was stated in *Maryland Casualty Co. v. Pacific Coal and Iron Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941):

The difference between an abstract question and a "controversy" contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*See also United Public Workers v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947) (Article III applies to declaratory judgments). Any alleged continued threat to union democracy is purely speculative and does not overcome the case or controversy requirement.

■ Because Johnson is no longer president and the current President Rivera does not disagree with the Executive Council with respect to the presidential power claims, there is no longer a controversy concerning those claims of "sufficient immediacy and reality" to justify a declaratory judgment. The lack of such an adversary relationship is highlighted by Rivera's presence in this litigation as both the presidential plaintiff and a defendant sued in his individual capacity. Finally, Johnson cannot litigate on behalf of the Union under a theory of associational standing when Local 1199 is a party to the suit and the Second Circuit has recognized that Johnson's and the Union's claims are not coextensive. *Johnson v. Kay,* 860 F.2d 529, 539 (2nd Cir.1988).

Accordingly, absent a live controversy, Johnson is not entitled to a declaratory judgment on any of the claims she asserts on behalf of the Union presidency. That Johnson has been succeeded by a new Union President who neither seeks to litigate

1. Johnson has also invoked § 301 of the Labor–Management Relations Act of 1947, Title 29 U.S.C. § 185, in support of each of her claims under the Union Constitution. However, for the reasons set forth in *Alford v. National Post Office Mail Handlers,* 576 F.Supp. 278, 285–86 (E.D.Mo.1983), the Local 1199 Constitution is not a contract "between labor organizations" within the meaning of § 301. Hence that statute does not confer jurisdiction upon this court to entertain the claims under the Local's Constitution. *See also Abrams v. Carrier Corp.,* 434 F.2d 1234, 1248 (2d Cir.1970), *cert. denied,* 401 U.S. 1009, 91 S.Ct. 1253, 28 L.Ed.2d 545 (1971) (that § 301 would create federal jurisdiction over claim under local constitution "open to grave doubt").

the presidential power claims nor disagrees with defendants on the merits thereof, that Johnson would rely on constitutional provisions which no longer exist (and have been replaced by new provisions reducing the President's powers), that any asserted interference with the President's claimed powers over communication on the constitutional referendum and over calling of a General Delegate Assembly meeting already has been remedied, and that the resolution which Johnson challenges pertain only to interpretations of constitutional provisions which have long since been amended, singly and in combination, serve to deprive this court of an actual case or controversy concerning the presidential power claims.

*The Executive Council Is Entitled To Dismissal Of The Action*

Johnson's claims to upset the Union's referendum in which the membership voted to amend the Constitution at the time of the November referendum are as follows:

a. Resolutions purporting to disapprove retroactively procedures followed in the November 1987 referendum were properly considered and adopted at the March 23, 1988 meeting of the Union's General Delegate Assembly (Complaint ¶¶ 87–88);

b. The process of amending the 1985 Constitution was not initiated in conformity with Article XII of the Local 1199 Constitution (Complaint ¶ 69);

c. Defendants campaigned at Union expense in favor of the proposal to amend the Constitution and deprived plaintiff Johnson of an opportunity to campaign at Union expense against that proposal (Complaint ¶ 70);

d. The membership was required to vote "yes" or "no" on a single package proposal to amend and was not given the opportunity to vote "yes" or "no" separately on each individual proposed change (Complaint ¶ 71); and

e. Statements by defendants in campaign literature to the effect that the 1985 Constitution contained provisions violative of federal labor laws were incorrect and misleading (Complaint ¶¶ 72–74).

Johnson has not set forth a dispute over the material facts nor sufficient evidence or facts to defeat Kay's summary judgment motion.

*The Johnson Resolutions*

On September 4, 1987 the Council initiated the proposal to amend the 1985 Constitution and the October 8 opinion of this court denied Johnson's motion to enjoin the membership referendum.

That opinion held that the proposal to amend had been initiated in conformity with the existing Union Constitution, that the proposal could lawfully be submitted to the membership as a single package proposal, that the proposal need not be voted upon by the membership at a single meeting held in one location, and that constitutional changes reducing an officer's powers could go into effect upon their adoption and need not abide conclusion of that officer's term of office.

The parties thereafter agreed that the referendum should be conducted by mail ballot and further agreed that no meeting of the General Delegate Assembly would be held before completion of the mail ballot referendum. On October 26, based in part upon the aforesaid agreements, the Special Master directed that the referendum be conducted by mail ballot and that the meeting of the General Delegate Assembly then scheduled for November 5 be postponed until after completion of the referendum. *See* Memorandum and Order of Special Master dated October 26, 1987. Later that same day, "[b]ased upon the parties' consent," this court adopted that Memorandum and Order in its entirety. *Id.*

In November 1987 the mail ballot referendum among the members of Local 1199 was conducted by the American Arbitration Association ("AAA"), under the direct supervision of the Special Master. On November 14, 1987 ballots were tabulated and the result announced, to the effect that the proposal to amend was adopted by majority vote of the membership. The result was formally certified by the Special Master.

On November 18 the Special Master denied a motion by Johnson for a stay of the effectiveness of the new Constitution pending Johnson's challenge to the legality of its adoption. No review of that decision by this court was sought.

After full discovery, a three-day evidentiary hearing was conducted by the Special Master in April 1988 on Johnson's motion to invalidate the constitutional referendum. On May 6, 1988 the Special Master granted Kay's motion for dismissal pursuant to Fed.R.Civ.P. 41(b), holding that Johnson had shown no right to relief. Johnson did not attempt review of that decision by this court and the validity of the Constitutional referendum was thereby established.

Johnson prepared a series of resolutions for consideration by the General Delegate Assembly at the next meeting of that body. Several of the resolutions sought to reverse interpretations of the 1985 Constitution made by the Council in determining the procedures for the constitutional referendum. The next meeting of the General Delegate Assembly, after some delay and difficulty as set forth above, occurred on March 23, 1988.

The Johnson resolutions would have construed the 1985 Constitution. The Resolution On Constitutional Amendments subtitled "Voting on Constitutional Amendments" would have meant that Art. XII required:

> that each proposed constitutional amendment, or at least each closely related group of amendments, *must* be voted upon by the membership separately, rather than the membership voting on all amendments in one total package as is being proposed.

The Resolution On Constitutional Amendments subtitled "Constitution Committee" would have barred the Council from appointing a committee either to study proposals to amend the constitution or to report to the Council with recommendations for amendments despite Art. XII(a)(2) which explicitly conferred upon the Council the authority to initiate amendments.

The Resolution On Constitutional Amendments subtitled "Membership Meeting to Vote on Constitutional Amendments" would have provided that a membership referendum only could have been conducted by one method: in-person voting at a single membership meeting held for all members of Local 1199, although it had been the consistent, longstanding and unquestioned practice of the Union to conduct referenda on constitutional amendments by means other than that which the resolution insisted was required.

The Resolution On Constitutional Amendments subtitled "Effective Date of Officer Amendments" would have interpreted the Constitution to preclude amendments enlarging or reducing the powers of elected officers from becoming effective during the term of office during which such amendments were approved although Art. XII(d) provided that any and all amendments "shall become effective upon [their] adoption unless otherwise provided for." *See Johnson v. Kay*, 671 F.Supp. at 276–277.

The Resolution on Constitutional Amendments subtitled "Constitutional Amendment Process and Delegate Assemblies" would have interpreted the Constitution to forbid a referendum on a proposal to amend the Constitution from being conducted whenever any delegate requested submission to the delegates of a challenge to a Council interpretation of the Constitution which was said to bear upon the amendment process to be followed. Such a resolution would have been inconsistent with Art. VII, § 10(b)(6), which recognized that constitutional interpretations by the Council would take effect before being reviewed by the delegates.

The remaining resolutions submitted by Johnson did not concern the referendum but, rather, were directed at other disputes between Johnson and the Council. Unlike the resolutions concerning provisions which allegedly pertained to the referendum procedures, these other resolutions addressed provisions of the 1985 Constitution which no longer existed after the November 1987 referendum. Each so-called Resolution On

President's Authority purported to interpret one or more clauses which were materially altered by adoption of the then current Constitution.

The procedure for adding an item to the agenda of a meeting of the General Delegate Assembly is set forth in detail in Art. VII, § 12(2)(j) of the current Constitution:

A Delegate desiring to include a matter on the agenda of the General Delegate Assembly ... shall forward such request in writing to the Executive Council at least thirty (30) days prior to such meeting. Should the Executive Council fail or decline to do so, the Delegate may have the matter included in the agenda by submitting a petition to the Executive Council signed by at least ten (10%) percent of the members in good standing of the General Delegate Assembly.... In addition, each member signing the petition must include his/her social security number, division and institution.

Local 1199 has in excess of 2,700 delegates. *See* Art. VIII, § 1(c) (one delegate for each 30 members per chapter or major fraction thereof) and the petition to add to the agenda thus required at least 270 signatures. On or about March 4, 1988, a member named Jerome Frazier, a political ally of Johnson, submitted to the Council 28 sheets stapled together, each with the identical title ("Petition") and heading: "to the Executive Council of Local 1199: I wish to have the attached resolutions voted upon at the November 5, 1987 General Delegate Assembly."

On the 28 sheets there appeared a total of 264 signatures. When those signatures were examined by the Executive Council prior to the scheduled March 23, 1988 meeting, it appeared that 12 signatures were not accompanied by a social security number, 33 were not accompanied by the division of the person whose name appeared, and 14 were not accompanied by the institution of the person whose name appears. There appeared to be 31 duplicate signatures. Further, a comparison of names on the petition with the most recent computer printout of Local 1199 delegates showed that 42 names appearing on the petition were of persons who were not in fact Local 1199 delegates.

Eight signatures were illegible. There were at least 9 questioned based upon a comparison of the petition signature with the same person's signature which previously appeared on another document, *e.g.*, a Local 1199 Benefit Fund enrollment card demonstrated an obvious difference.

According to the Council, the petition contained at least 116 signatures which were not valid.

More than five months had elapsed between the Council's refusal to add the Johnson resolutions to the agenda and the March 1988 meeting of the General Delegate Assembly. The Johnson forces began collecting petition signatures shortly after the Council's determination. Except for the month of November 1987, delegates from each of the Local 1199 divisions met together monthly during that time.

No material facts have been put in issue with respect to the petition process or the exclusion of the items raised by Johnson at the March 23 Delegate Assembly. In addition, each sheet constituting the petition started in part: "I wish to have the attached resolutions voted upon at the November 5, 1987 General Delegate Assembly." However, there were in fact no resolutions attached to any of the 28 sheets constituting the petition, nor to those sheets as stapled together.

Finally, as set forth above, no challenge was lodged with the Special Master concerning the procedures or the outcome of the March meeting. The Johnson resolutions could not have been entertained properly at the General Delegate Assembly.

*The Presidential Power Claims*

The Presidential Power claims are either mooted by this court's opinions or fail to present a live controversy as described above.

*The Remaining Claims*

Johnson also asserted that defendant Kay failed to timely file LM–2 Reports for Local 1199 with the U.S. Department of Labor for the Local's fiscal years ending September 30, 1986 and September 30,

1987, respectively. *See* Comp. ¶ 27. Kay is no longer Secretary–Treasurer of Local 1199 and has no responsibility for or connection with the preparation or filing of LM–2 Reports and the requisite reports have now been filed. No present relief is sought against Kay, and therefore there is at present no case or controversy between Johnson and Kay sufficient to warrant the court's entertaining of this issue.

Johnson also has complained with respect to three resolutions adopted by the Union's Executive Council on November 18, 1987 relating to the Delegate Assembly meeting. *See* Complaint ¶¶ 89–93. The resolution denominated Resolution B sought to validate the Council's constitutional interpretations until and unless invalidated by the General Delegate Assembly. Resolution B was a reasonable interpretation of the current Constitution and, in particular, of Art. VII, § 10(c)(6) thereof, by the union body authorized to make such an interpretation.

Resolution D required a majority vote of delegates in each Division in order to override a Council interpretation of the Constitution was also a reasonable interpretation of the current Constitution and, in particular, of Art. VII, § 10(c)(6).

When the Constitution intended to permit a delegate override of a Council determination merely by the combined vote of all Division Delegate Assemblies, rather than by the vote of each Division Delegate Assembly, it said so. *Compare* Art. VII, § 10(c)(6) with Art. VII, § 10(c)(14) (Council empowered to fix various salaries "subject to approval of the majority of the combined vote of all the Division Delegate Assemblies").

Art. VII, § 12(1)(c), contrary to Johnson's position, has no application where the voting requirements for a delegates' determination are addressed specifically elsewhere in the Constitution (as an override of a constitutional interpretation is specifically addressed in § 109(c)(6)). Section 12(1)(c) applies only to an adoption by the General Delegate Assembly of a proposal on a matter not addressed specifically in the Constitution and serves to preclude adoption of such a proposal where a majority of the division delegate assemblies voted but where the combined voting delegates in all divisions did not.

Resolution E resolved that the Johnson resolutions would not be included in the agenda of a meeting of the General Delegate Assembly. The Constitution confers upon the Council the initial authority to determine whether a matter is to be included in the agenda of a meeting of the General Delegate Assembly. *See* Art. VII, § 12(2)(g) (Council empowered to "decline to" include matter on agenda). Resolution E was an exercise of this authority.

Johnson has also challenged the May 1988 meeting of the General Delegate Assembly (Complaint ¶¶ 94–95) but has not identified any injury from what she asserts was defendants' wrongful conduct. No challenge has been lodged with the Special Master with respect to action taken. No effort was made to place an item on the agenda of that meeting through the constitutionally authorized procedure of making such a request in writing to the Council.

In addition, the 1985 Constitution mandated that the General Delegate Assembly meet at least twice a year. *See* Art. VII, § 11(1)(b). After calling a General Delegate Assembly meeting in the fall of 1987, which meeting was eventually held in March 1988, Johnson failed and refused to call any other such meeting during her entire term in office. In this circumstance, the Council was empowered to call the meetings of the General Delegate Assembly to assure compliance with § 11(1)(b). Johnson has also claimed lack of notice of the May 1988 meeting, although the meeting date was noted by this court in its opinion dated February 4, 1988. In any case, there is no notice requirement imposed by the Constitution and no injury alleged to have resulted from any lack of notice.

It is also alleged that defendants "schemed and planned" to have delegates line up at microphones at the beginning of the August 1988 meeting of the Guild and Hospital Division Delegate Assemblies, "for the purpose of" preventing plaintiffs

from speaking at the meetings. *See* Complaint ¶ 96.

However, Johnson does not allege that the objective was accomplished or that any of the plaintiffs sought to address the delegates at these meetings but was actually prevented from doing so. Without such allegations and evidence tending to support it on this motion for summary judgment, there could be no interference with any plaintiff's rights under the LMRDA or Union Constitution nor other legally cognizable injury to any plaintiff.

Similarly, the allegations that defendants "schemed and plotted" to disrupt September 1987 meetings of Division Delegate Assemblies (Complaint ¶ 33) and "planned and arranged" for persons not entitled to attend Division Delegate Assemblies to attend those meetings "for the purpose of" disruption (Complaint ¶ 34) must likewise fail for lack of injury and factual support.

In Complaint ¶ 30, it is alleged that at a Council meeting one defendant, Yearwood, "attempted to assault Johnson" and that he "assaulted" one Dave White. There is no allegation that Yearwood actually assaulted Johnson nor that he actually interfered in any way with her exercise of whatever rights she may have possessed. As to the alleged assault of White, White is not a party here, and plaintiffs lack standing to litigate an alleged denial of a third party's rights. *McGowan v. Maryland*, 366 U.S. 420, 429–30, 81 S.Ct. 1101, 1106–07, 6 L.Ed.2d 393 (1961).

In Complaint ¶ 32, it is alleged that Union staff "glared at Johnson in a menacing manner" at an Executive Council meeting in September 1987. It is further alleged that "this incident was planned and directed by Kay and the other defendants."

In Complaint ¶ 37, it is alleged that at a September 8, 1987 meeting of the Hospital Division Delegate Assembly, a defendant, Jarrett, "grabbed the microphone" from one Pat Bernitt, who took the microphone back from Jarrett and then spoke to those present at the meeting about Jarrett. There is no allegation of injury here even to Bernitt, or to any plaintiff.

In Complaint ¶ 40, it is alleged that defendant Jarrett "approached" plaintiff Johnson while the latter was speaking (apparently at a meeting of the guild Division Delegate Assembly). There is no allegation that Jarrett struck Johnson and no allegation he interfered with Johnson speaking. There is no allegation that Johnson was injured in any way, physically or otherwise.

The Complaint in ¶ 41 alleges that defendant Yearwood "charged at" a delegate, one Akil Al–Junde, who "stood his ground" and that Yearwood "moved menacingly" toward Al–Junde.

Whatever else these claims of physical violence or inappropriate conduct may constitute in the context of union controversy, they fail to state a LMRDA violation.

Finally, in Complaint ¶ 68, Johnson alleges that she was "physically assaulted without cause or provocation by defendant Kay, and suffered serious injuries thereby."

In December 1987, prior to adding this claim to her complaint herein, Johnson filed in a New York Supreme Court action a counterclaim against Kay for assault and battery based upon the same factual allegations as are made here. *Edward Kay v. Georgianna Johnson*, No. 87–25879 (New York County). In November 1988, Johnson added this incident to her charges in the instant case. The state court action, in which Johnson is represented by one of her lawyers in this case, remains pending.

Although the parties vigorously dispute the particulars of what happened on October 8, 1987, two related circumstances render Johnson's LMRDA claim appropriate for disposition by summary judgment. The first is that plaintiff Johnson, in her sworn deposition testimony, described her encounter with Kay at the October 8 meeting of the Guild Delegate Assembly as an "accident." The second is that plaintiff seeks to recover from Kay for this accident solely in his individual capacity and not in his official capacity.

■ A union officer may, in appropriate circumstances, be sued in his/her individual capacity for damages for acts undertaken

in an official capacity. However, a different standard governs an officer's liability for damages in his/her individual capacity then governs that officer's liability for damages for the same conduct in his/her official capacity.

■■ Where an officer acts in good faith, she may not be held accountable in damages in her individual capacity. *Keene v. International Union of Operating Engs.*, 569 F.2d 1375, 1381, fn. 7 (5th Cir.1978); *Waring v. International Longshoremen's Ass'n Local 1414*, 665 F.Supp. 1576, 1581–82 (S.D.Ga.1989); *White v. King*, 319 F.Supp. 122, 126 (E.D.La.1970). The reason is obvious: a rule which would render an officer individually liable in damages for conduct undertaken in good faith would deter many qualified persons from seeking union office, for fear of exposure to personal financial liability for conduct which the person did not intend to be offensive or violative of a member's legal rights.

Defendants are entitled to summary judgment.

### Johnson Is Entitled To Legal Fees

Having prevailed with respect to her application for preliminary injunction Johnson is entitled to legal fees, contrary to the usual American rule, an entitlement somewhat perplexed once again by the present status of the parties.

On September 18, 1989, former counsel to Johnson filed a motion for leave to withdraw subject to the right to file the instant fee application.

An order entered on September 25, 1989 reads as follows:

> On the basis of Counsel for Plaintiffs' Motion to Withdraw and other pleadings and arguments submitted herein it is hereby
>
> ORDERED, that the firm of Bernstein & Lipsett is hereby granted leave to withdraw herein subject to its right if any to seek an award of attorneys' fees and expenses herein.

The words "if any" were inserted at the September 25, 1989 hearing to preserve whatever claims Johnson might advance for fees charged by her former counsel.

Counsel for Johnson represented plaintiffs and withdrew subject to any right to seek fees. Present and substituted counsel for Johnson, in a notice of adoption dated May 1, 1990, has asserted her application in this regard, satisfying the standing requirements set forth in *Hall v. Cole*, 412 U.S. 1, 2, 5, 93 S.Ct. 1943, 1944, 1946, 36 L.Ed.2d 702 (1973).

Johnson's former counsel seeks $572,-447.25 and expenses totalling $81,636.94.

### Standards For Fees

■■ Attorneys' fees and expenses may be awarded in actions arising under Title I of LMRDA, under *Hall*, affirming the decision of the Court of Appeals in *Cole v. Hall*, 462 F.2d 777 (2d Cir.1972). The reasoning has been followed in *Rosario v. Amalgamated Ladies Garment Cutters' Union, Local 10, I.L.G.W.U.*, 605 F.2d 1228, 1245–46 (1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1980); *Zamora v. Local 11, Hotel Employees & Restaurant Employees*, 817 F.2d 566, 571 (9th Cir.1987); and *Pawlak v. Greenawalt*, 713 F.2d 972, 975–76 (3d Cir.1983).

■■ *Hall* has also been extended to cases under Title IV, LMRDA, in which union members have been awarded attorney's fees for their participation as intervenors in suits brought by the Secretary of Labor to set aside union elections. *See Donovan v. CSEA, Local 1000*, 784 F.2d 98, 104 (2d Cir.1986), *cert. denied*, 479 U.S. 817, 107 S.Ct. 74, 93 L.Ed.2d 30 (1986).

■■ In the absence of final adjudication, attorneys' fees may still be awarded. In *Yablonski v. United Mine Workers of America*, 466 F.2d 424, 431 (D.C.Cir.1972), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973), the Court of Appeals declared:

> It is suggested that it is unfair to impose attorney's fees in cases which have never reached final adjudication on the merits. The Supreme Court in *Mills*, [*supra*], however, noted that the relevant inquiry is not into the technical posture of the litigation, but whether it "has conferred a substantial benefit on the

members of an ascertainable class." 396 U.S. at 393–94, 90 S.Ct. at 626.

It is not decisive in this instance that three of the suits never got beyond the issuance of preliminary injunctions, and the fourth failed even to do that. The fact is that in the former three cases the preliminary injunction was the critical step and procured all the relief required; and in the fourth case the very filing of the complaint and the holding of a hearing on the motion for a preliminary injunction effected a change of position by the defendants which warranted the court's conclusion that no mandatory order was necessary to achieve the plaintiff's aims. As all lawyers know, a lawsuit does not always have to go to final adjudication on the merits in order to be effective. Assuming the effectiveness in terms of practical results, the litigating stage attained is relevant only to the amount of the fees to be allowed and not to the issue of whether they should be awarded at all.

*See Peacock v. Wurf,* 475 F.Supp. 65, 67 (S.D.N.Y.1979).

Recently, the Honorable Vincent L. Broderick, in an unreported decision, *Goldberg v. Hall,* 87 Civ. 8025, 1988 WL 215393 (S.D.N.Y.1988), awarded fees in an LMRDA Title I case even though "no ruling whatsoever had been made by the court ..." (Opinion, p. 9), on the ground that "[w]here a LMRDA action results in a common benefit for union members even though a ruling was not entered, attorney's fees may be awarded." (Opinion, pp. 9–10).

The fee application here is strikingly similar to that filed and granted in *Bakery and Confectionery Workers v. Ratner,* 335 F.2d 691 (D.C.1964). There, an attorney who had undertaken litigation on behalf of union members designed to correct financial and other malpractice by union officers sought (1) leave to withdraw as counsel; (2) the appointment of "independent counsel" to continue to prosecute the action; and (3) attorney's fees. The district court granted counsel's motion to withdraw but denied the motion for appointment of "independent counsel ... only

upon the representation by the appellant [union's] counsel 'that the Union intend[ed] to employ independent counsel to pursue the accounting action'." Finally, the district court granted counsel's fee application against "the contracting parties who entered into the fee agreement, ... the class represented by [the] named plaintiffs ... [a]nd third ... against the funds of the Union." 335 F.2d at 695.

On appeal by the Union, the Court of Appeals upheld the award of fees:

Here almost from the outset, the International was a party. At no time did it controvert the facts as attested in the appellee's affidavit or as perceived and expressed by the District Judge in charge throughout. The International had received the benefits form the appellee's services in various respects including those derived from the class action, and thereafter had taken over prosecution of the litigation. The International and its membership had notice of all proceedings and had participated therein. For the reasons but upon the basis previously treated, there remains only the matter of ascertainment of the value of the benefits to the International and its membership to predicate whatever award the District Court equitably shall determine to be due.

335 F.2d at 697.

Further, *Ratner,* was cited approvingly in *Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 391, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970), in which the Supreme Court supported an interim award of legal fees to plaintiff corporate shareholders who had substantially benefitted a corporation through their lawsuit. *See also Gluck v. Bowen,* 676 F.Supp. 165 (N.D.Ill.1987) (counsel for plaintiff withdrew before plaintiff ultimately prevailed in a social security case, sought fees, and prevailed).

Here the Union was made a party midcase by order of the Court of Appeals. Pursuant to the Court of Appeals' mandate the district court was directed to "assure the adequacy and independence of the union's representation", an event which materially affected any benefit to the Union

attributable to the efforts of Johnson's counsel.

Johnson urges consideration of authorities in Title I LMRDA action where fees have been awarded even where "no ruling whatsoever [has] been made by the Court ... where a LMRDA action results in a common benefit for union members...." For as put by Judge Tuttle, sitting by designation in *Reiser v. Del Monte Properties Co.*, 605 F.2d 1135, 1140, n. 4 (9th Cir.1979):

> It is not necessary to an award of attorneys' fees that a suit be litigated on the merits. *Kopet v. Esquire Realty Co.*, 523 F.2d 1005, 1008 (2d Cir.1975); *Yablonski v. United Mine Workers*, 151 U.S.App.D.C. 253, 260, 466 F.2d 424, 431 (D.C.Cir.1972), *cert. denied*, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973); *Kahan v. Rosenstiel*, 424 F.2d 161, 167 (3d Cir.), *cert. denied*, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); *Globus, Inc. v. Jaroff*, 279 F.Supp. 807, 809 (S.D.N.Y. 1968).

*Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), cited by counsel, a civil rights action, involved the award of fees under 42 U.S.C. § 1988. However, in contrast to the situation which prevails under Title I, LMRDA described above, § 1988 expressly declares that in a civil rights action a court may award fees only to a "prevailing party."

The Council also correctly cites *Rosario v. Amalgamated Ladies Garment Cutters Union, Local 10*, 749 F.2d 1000 (2d Cir. 1984), for the proposition that *Hensley* is applicable to LMRDA actions· and that under Title I, unsuccessful claims that are "unrelated to those benefitting [the union's] members, such as the plaintiffs' state law claims against [defendant] Dolgen for malicious prosecution and false arrest," may be distinguished from claims that are "different from the issues on which plaintiffs prevailed," but are "not so discrete as to be easily separable ..." 749 F.2d at 1007.

■ Here Johnson, who originally went to court on September 8, 1987, succeeded in obtaining a settlement with defendants of her claims for certain declared rights of equality, and free speech and assembly.

The injunctions sought by Johnson provided for communication with the 80,000 members of the union by mail at union expense as well as the convening of a General Delegate Assembly on March 23, 1988. Such relief constitutes "prevailing" within the meaning of § 1988.

In addition, though not prevailing in terms of her particular interests, Johnson's attorneys represented in her interests as president throughout in the proceedings before the Special Master which benefitted the union and its members and indeed permitted the union's affairs to go forward in face of the paralyzing conflict between the President and the Council.

■ ·However, even these determinations do not yet assure Johnson of the success of her application for fees in view of her counsel's failure to maintain complete contemporaneous time records.

In *NYSARC v. Carey*, 711 F.2d 1136, 1147 (2d Cir.1983), the Second Circuit set forth rules that it would no longer accept reconstructed time records in support of fee applications, stating:

> We think it appropriate to convert our previously expressed preference for contemporaneous time records [citation omitted], into a mandatory requirement, as other Circuits have done, see *National Ass'n of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319 (D.C. Cir.1982).

*Id.* The Court further stated that the "contemporaneous time records must specify for each attorney, the date, the hours expended, and the nature of the work done." *Id.* at 1148.

However, in *Carrero v. New York City Hous. Auth.*, 685 F.Supp. 904 (S.D.N.Y. 1988), an award of attorney's fees under 42 U.S.C. § 1988 was granted in the context of a civil rights action based upon reconstructed rather than contemporaneous time records.

In *Carrero,* at the trial level this court stated as follows with regard to those fee issues:

Defendants contend that attorney's fees should be reduced because counsel failed to adequately describe the nature of the work performed in time records and because counsel failed to discount billing for certain activities such as filing and travel time.

In this Circuit, providing contemporaneous time records is a prerequisite to receiving attorneys' fees. *New York State Association for Retarded Children, supra,* 711 F.2d at 1147. The reasoning for this rule is that courts should not be faced with an impossible chore when making fee determinations, and that lawyers should not be required to expend even more hours reconstructing the past in assembling a fee application. *Id.* at 1147–48.

Where the attorneys have provided the court with affidavits that have been reconstructed from contemporaneous records and that set forth all charges with specificity, fees have not been denied. *See Lenihan* [*v. City of New York* ], *supra,* 640 F.Supp. [822] 824 (S.D.N.Y.1986). Such was the case here. Sussman and Levy have, for the most part, set forth the date, task and time spent for all charges in their affidavits, and although at times Sussman fails to provide the court with the reason for a phone conversation with co-counsel, Mr. Levy's records adequately reflect the reason.

However, penalties have been imposed for failure to provide the actual records. Carrero's counsel contends that contemporaneous time records were offered to the defense and were refused. Nevertheless, the burden is on the party seeking fees to present such records to the court, whether or not defendants have requested production. Since no such records were presented here, no remuneration will be granted for hours spent on the fee application. *Lewis v. Coughlin,* 801 F.2d 570, 577 (2d Cir.1986).

Additionally, inconsistencies in the attorney's records will be cut, for example

telephone calls one claims to have made to the other that do not appear in the other's records.

Although some courts have permitted only reduced rates for some activities, such as travel time and the filing and service of papers, such a reduction is not mandatory. *See Lenihan, supra.* In view of the fact that a proportionately small amount of time in this case was devoted to such activity, fees will not be reduced.

685 F.Supp. at 908–09 (footnote omitted).

The Court of Appeals found no error with this approach, *Carrero v. New York City Hous. Auth.,* 890 F.2d 569–582 (2d Cir.1989). Here again the reconstructed timesheets have been submitted to clarify the contemporaneous timesheets. In addition, in recognition of deficiencies in their time records and the substantial amount of travel time involved from their office in Washington, counsel voluntarily proposed a 20% reduction of the total amount sought for fees in an effort to avoid major litigation over fees.

Under all these circumstances, counsel for Johnson is entitled to fees incurred in connection with the entry of those activities reflecting a benefit to the Union, specifically the preliminary injunctions and the appearances before the Special Master, excluding travel disbursements, and reducing this amount by 20%. No fee will be awarded in connection with the fee application.

Based upon the experience of the attorneys involved, their billing rates are appropriate. Hopefully the parties can resolve the amounts at issue based upon these determinations. If not, a further hearing on motion may be required and counsel would be required to set forth each entry that related to the claims on which Johnson has prevailed.

*Sanctions Are Denied*

The posture of this litigation requires that all sanctions be denied. Whatever has been done has been undertaken by all the parties in good faith. Continued litigation will serve no therapeutic purpose for the former president, the present president, the

**838**

former members of the Executive Council, the union or their counsel.

Judgment will be entered on notice in accordance with this opinion.

It is so ordered.